LOCAL 636 OF the UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPE FITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

DETROIT ASSOCIATION OF PLUMBING CONTRACTORS et al., Respondents.

Nos. 15665, 15707.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 1, 1960.

Decided Jan. 19, 1961.

Petition for Rehearing Denied March 22, 1961.

Mr. Patrick C. O'Donoghue, Washington, D. C., with whom Messrs. Martin F. O'Donoghue and Thomas X. Dunn, Washington, D. C., were on the brief, for petitioner in No. 15,665.

Mr. Morton Namrow, Atty., National Labor Relations Board, with whom Messrs. Stuart Rothman, Gen. Counsel, National Labor Relations Board, Dominick L. Manoli, Associate Gen. Counsel, National Labor Relations Board, Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, and Allison W. Brown, Jr., Atty., National Labor Relations Board, were on the brief, for respondent in No. 15,665 and petitioner in No. 15,707.

Mr. Leslie W. Fleming, of the bar of the Supreme Court of Michigan, Detroit, Mich., pro hac vice, by special leave of court, for all respondents except United Engineers and Constructors, Inc., in No. 15,707. Mr. George P. Lamb, Washington, D. C., was on the brief for all respondents except United Engineers and Constructors, Inc., in No. 15,707.

Mr. William M. Saxton, of the bar of the Supreme Court of Michigan, Detroit, Mich., pro hac vice, by special leave of court, for respondent United Engineers and Constructors, Inc., in No. 15,707. Mr. George P. Lamb, Washington, D. C., was on the brief for respondent United Engineers and Constructors, Inc., in No. 15,707. Miss Carrington Shields, Washington, D. C., also entered an appearance for respondent United Engineers and Constructors, Inc., in No. 15,707.

Before PRETTYMAN, DANAHER and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

These proceedings stem from a cease and desist order issued by the National Labor Relations Board [Board], based on the Board's finding that participation by certain employees of the companies named above in the internal affairs of Local 636 constituted employer violations of §§ 8(a) (1) and (2) of the Labor Management Relations Act of 1947 (Taft-Hartley Act), 29 U.S.C.A. § 158(a) (1, 2). Those two sections of the act define as unfair labor practices (1) employer interference with the exercise of rights guaranteed by § 7 of the Act, 29 U.S.C.A. § 157 (the right to organize and bargain collectively), and (2) employer interference with or domination of the administration of a labor organization.

In case No. 15,655, petition was filed by Local 636, naming the Board as respondent, for review to set aside, enjoin or modify the cease and desist order. In case No. 15,707 the Board filed a separate petition for enforcement of the cease and desist order, naming as respondents the companies named in the order. Because the issues raised by the two petitions are identical, the cases were consolidated for our consideration.

I

The companies named in the order, the local union, and the individuals involved are all connected with the building trades industry in and around Detroit, Michigan. The Board's order was predicated on its previous decision in Nassau and Suffolk Contractors' Association, 118 N.L.R.B. 174 (1957), in which the Board expressly recognized a unique feature of the building trades industry, the extreme upward and downward mobility of the positions of men working in the industry. Recognizing also the desire of various foremen and other supervisory employees in this industry to retain their union membership in a rank-and-file union as a type of job security so that they would be able to obtain work as journeymen if they were ever laid off in or surrendered their higher capacities, the Board sanctioned the practice in Nassau. In the present case, there was uncontradicted testimony before the Board that frequently a man was hired as a foreman on one job and as a journeyman on the next. In the order under consideration here, while requiring that certain union activity of supervisory employees cease,

the Board required no one to completely relinquish his union membership.

## II

We turn now to a consideration of the facts before the Board.

*William Kelley:* Kelley is employed by respondent United Engineers and Constructors as General Foreman of Pipefitters, with supervision over from 220 to 225 workmen, including a number of foremen. Under the supervision of his own superior, he hires men and also transfers them from one job to another. He assigns jobs to foremen and, on behalf of the employer, handles grievances relayed to him through shop stewards. His compensation is $80 per week more than that of a journeyman, and he has held his supervisory position for seven years.

Kelley is president of Local 636. His duties are to preside at meetings, make various decisions, sign checks, call special meetings, vote for officers, vote to break ties, impose fines and penalties, and to appoint committees. Payments are made, on his behalf, to various union funds by the respondent company. At all times pertinent to this petition, the company knew of but was not interested in Kelley's union activities, nor did it take any position in that respect.

*Cyril M. Kruger:* Kruger has been an employee of Johnson Service Company for thirty-three or thirty-four years and, for at least ten years, has held the position of superintendent of construction, with supervisory authority over 54 pipe fitters, including 6 supervisors. He has complete authority to direct or assign work, to hire, lay off and discharge, and to handle grievances of employees under his supervision. He receives about $30 a week above the wages of a journeyman pipe fitter. Although the company knew of Kruger's position in the union, it never instructed him to refrain from engaging in union affairs.

*Edward McDonald:* McDonald is employed by respondent Goss Mechanical Construction Company as general heating foreman. He is admittedly a supervisor, having 40–60 men under him including 6–10 foremen, to whom he has authority to assign job tasks. He earns $34 per week more than a journeyman and has been employed in his present capacity for one year, prior to which he had been employed for three years as job foreman by the same company.

McDonald is an active member of Local 636, attending meetings and voting. Payments have been made, on his behalf, to various union funds by the company. The company was not shown to have encouraged his membership in the union.

*Alvin McShane:* McShane is employed by respondent J. W. Partlan Company, with general supervision of its pipefitting crews, consisting of 10 to 100 men, including 4 to 5 crew foremen. He has authority to hire, discharge, transfer, lay off, recall, assign, direct and discipline, and to adjust grievances. He is paid $80 per week more than a journeyman and has been included whenever the company paid executive bonuses. He has held this job for 10 years.

McShane is a member of the election committee of Local 636, and is charged with the duty of checking with the operator of voting machines (when used), tallying votes, ruling on eligibility, and counting ballots. Payments were made, on his behalf, to various union funds by the company. The company was not shown to have encouraged his union membership or his participation in the union's election committee.

*Harold Derocher:* Derocher is employed by respondent Donald Miller Company as general supervisor of its pipefitting crews, with supervision of from 30 to 100 employees, including 3 job foremen and 6–20 area foremen. He has authority to hire, discharge, transfer, lay off, recall, assign, direct and discipline. He is the highest paid non-officer supervisor of the company and received executive bonuses of $3500 or more in 1957 and 1958. He has held this position for 14 years.

Derocher serves on the election committee of Local 636. The company made various payments on his behalf to union

funds but was not shown to have encouraged Derocher to remain in the union or in his participation in the union's election committee.

*Hugo Sieger:* Sieger is employed by the Farrington Company as general field superintendent, with supervision of its pipefitting crews of 25–80 employees, including 8–15 crew foremen. He has authority to hire, discharge, transfer, lay off, recall, assign, direct and discipline, and is the highest paid supervisor of the company other than officers and owners. He has held this position for 14 years.

Sieger has been for eight years a member of the Executive Board of Local 636 and is charged with settling all questions and cases in dispute, disciplining members for various violations and serving on the negotiating team. The company made payments on his behalf to various union funds but was not shown to have encouraged his interest in his union activities.

*Donald McNamara:* McNamara is employed by Farrington Company as job foreman, with supervision over 10–20 employees. He has authority to assign men to various jobs and to recommend layoffs.

McNamara is also a member of the Executive Board of Local 636. The company made payments to various union funds on his behalf but was not shown to have encouraged his union activities.*

### III

On the basis of the above facts, the Board issued a cease and desist order in two parts. Part A of the order was directed against respondents Detroit Association of Plumbing Contractors and the Mechanical Contractors Association of Detroit and covered collective bargaining negotiations with a committee representing the union including, as members of the committee, supervisory employees of respondents. Part B of the order was directed against respondents Farrington Co., Goss Co., Partlan Co., Miller Co., Johnson Co., and United Engineers and covered participation by supervisors in such union activities as voting in elections and holding office.

Both the Board and respondents (and the union) recognize that there is no question of labor-management corruption here. For purposes of this consideration, we expressly assume that there was complete good faith on the part of all the parties and that the supervisory employees involved at all times acted honestly on behalf of the interest which they were at the particular time charged with representing.

Respondent companies here uniquely take the same position as the union in arguing that §§ 8(a) (1) and (2) require some showing of actual agency before an employer can be charged with the intra-union activity of his supervisory employees. At the very least, the parties argue, there must be a showing that the supervisors, in their intra-union activities, were acting on behalf of their employers even though their actions were not expressly authorized or subsequently ratified. The parties further argue that § 14(a) [1] of the Act of 1947 expressly guarantees to supervisory employees the right of union membership, which right would be a nullity without the right of participation. Thus the Board, it is argued, has violated § 14(a) by its order.

The Board takes the position that traditional concepts of agency are not to be relied on and that its case-by-case ap-

---

* The contracts between the union and the companies, insofar as wages are concerned, deal only with journeymen. As members of the union, the individuals do participate in various union funds covered by the collective bargaining contract, such as the pension and vacation funds.

1. "Sec. 14(a). Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this Act shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining." 29 U.S.C.A. § 164(a).

proach on the particular facts presented is correct under the statute. The Board further says that the only right of membership guaranteed by § 14(a) is precisely the right of nominal non-participating membership which it carefully permitted by its order.

## IV

■ We agree with the Board that strict principles of agency are not to be applied in determining employer responsibility, under the Act, for union activities of supervisory employees. The Supreme Court has spoken quite clearly on this subject in two cases decided under the Wagner Act (National Labor Relations Act) of 1935, 29 U.S.C.A. § 151 et seq.

In International Association of Machinists etc. v. National Labor Relations Board, 1940, 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50, the Supreme Court said:

> "The employer * * * may be held to have assisted * * * a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of *respondeat superior*. We are dealing here not with private rights * * * nor with technical concepts pertinent to an employer's legal responsibility to third persons * * * but with a clear legislative policy to free the collective bargaining process *from all taint of an employer's compulsion, domination, or influence*." [Emphasis supplied.]

And in H. J. Heinz Co. v. National Labor Relations Board, 1940, 311 U.S. 514, 521, 61 S.Ct. 320, 323, 85 L.Ed. 309, the Supreme Court said:

> "The question is not one of legal liability of the employer in damages or for penalties on principles of agency or *respondeat superior*, but only whether the Act condemns such activities as unfair labor practices so far as the employer may gain from them any advantage in the bargaining process * * *."

We know of nothing in the Act of 1947 or in the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.A. § 401 et seq., which affects the vitality of the two earlier decisions mentioned above. Indeed, the "Definitions" section of the 1947 Act seems to affirmatively indicate a desire to abrogate strict principles of agency in determining employer responsibility.

> "Sec. 2. When used in this Act
> * * *
>
> * * * * * *
> "(2) The term 'employer' includes any person acting as an agent of an employer, directly or indirectly * * *.
>
> * * * * *
> "(13) In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C.A. § 152.

Following enactment of the sections quoted above, the Supreme Court again spoke, in Radio Officers' Union etc. v. National Labor Relations Board, 1953, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455:

> "The policy of the Act is to insulate employees' jobs from their organizational rights." At page 40 of 347 U.S., at page 335 of 74 S.Ct.

> "[T]hat specific proof of intent is unnecessary where employer conduct inherently encourages or discourages union membership is but an application of the common law rule that a man is held to intend the foreseeable consequences of his conduct. * * * Thus an employer's protestation that he did not intend to encourage or discourage must be unavailing where a natural consequence of his action was such encouragement or discouragement." At page 45 of 347 U.S., at page 338 of 74 S.Ct.

■ On the basis of the statutes and cases cited above, we agree with the Board that an employer may properly be held responsible for "interfering" in the affairs of a union because of participation by his supervisors even though such participation was not expressly authorized or ratified.

## V

The next problem lies in determining whether "interference" by the employer can exist in a case such as this where it is conceded by all concerned that the supervisors, in their intra-union activities, at all times acted in what they considered in complete good faith to be the best interests of the union. In this context we are concerned with the impact upon the rank-and-file journeymen members of participation and leadership within the union by supervisors.

■ The "Bill of Rights" of the Labor-Management Reporting and Disclosure Act of 1959 in pertinent part provides:

"Sec. 101. (a) (1) * * * Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections * * * *and to participate in* the deliberations and voting upon the business of such meetings * * * (2) * * * Every member * * * shall have the right to * * * express any views, arguments, or opinions; and to express at meetings * * * his views * * * upon any business properly before the meeting less * * *."

We think that § 101(a) (1) and (2) of the 1959 Act merely amplifies and does not change the meaning of the 1947 Act which reads in pertinent part:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bar-gaining or other mutual aid or protection * * *."

■ It is obvious that two persons may be sincerely concerned with the best interests of a group or organization and yet may honestly differ basically on what each conceives to be consistent with that "best interest." We do not hold that either the 1947 or the 1959 Act gives to any employee a right to have his views adopted by his union; we do hold, however, that both Acts give each and every employee an absolute right to make his views known to his fellows and to urge his position to them. In our view anything which might tend to inhibit that right is "interference." If intra-union participation by supervisors tends to inhibit this right, then such participation is "interference" unless it is protected by the Act. If that participation is not protected by the Act and if it can be charged to the respondent companies, then it is "interference" by the companies, and the Board's order should be enforced.

James P. Duffy, a rank-and-file journeyman member of Local 636, who filed the original complaint before the Board, testified at the hearing in part as follows:

"[The superintendents] wouldn't hire me whether they knew me or not, what kind of a mechanic I was or anything else. These people would show, maybe, because maybe I opened my mouth at the local, I got in trouble with one of the business agents and this political business between the superintendents and the contractors and the business agents work a hardship on the members of this union, and not only me * * *. I mean probably hundreds of members to the point that the membership is so scared in our union local that they wouldn't open their mouth if the union was to give away fifty thousand dollars * * *. If somebody is in bad with the union and goes to work for a contractor to work, he might be the best mechanic

that the contractor ever had, but he won't last long. * * * I think the very presence of these supervisors and superintendents * * * and a few of these people that are year in and year out on these jobs. I don't think there is any reason for them to be in the union."

The possibility certainly exists that Duffy is right in saying that some of the members are afraid to oppose policies in union affairs advocated by the supervisors for fear of losing their jobs the very next day when the supervisor resumes his role in the company and takes up the task of hiring and firing.

As the Supreme Court said in International Association of Machinists, supra, 311 U.S., at page 80, 61 S.Ct. at page 88:

"[I]nterference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice * * *."

■■ We think that active participation in union affairs by supervisors was aptly characterized as "interference" by the Board. We also agree with the Board in charging the interference thus found to the respondent employers. "The policy of the Act is to insulate employees' jobs from their organizational rights." Radio Officers' Union, supra, 347 U.S. at page 40, 74 S.Ct. at page 335. "We are dealing here * * * with a clear legislative policy to free the collective bargaining process from all taint of an employer's * * * influence." Machinists, supra, 311 U.S. at page 80, 61 S.Ct. at page 88.

We note that the Board has here sought as remedy merely the entry of the cease and desist order. The "interference" in this case flows directly from the supervisors' company positions and their opportunities to exercise certain exclusive prerogatives of management (hiring, firing, disciplining, etc.). When this power is placed in the hands of a particular employee, the employer has an obligation to insure that the power will not be used contrary to law and he may not claim that he did not know of the employee's intra-union activities. Nor do we agree with counsel for respondent companies that, by inquiring about union activities before promoting men from the ranks, the companies would be guilty of anti-union practices. No man should be denied promotion because of union activity; each man should merely be required to discontinue activity which would be unlawful on the part of a supervisory employee.

### VI

■■ We turn now to the claim of the union that § 14(a) of the 1947 Act expressly guarantees to supervisors the right to belong to a union. Of course, the Board's order carefully permits all persons concerned to retain their basic union membership. In Nassau, supra, the Board recognized the legitimate desire of supervisory employees to retain union membership as a form of job insurance in the event they should in the future seek work as journeymen, but the union argues that membership, to be meaningful, must include the right to participate.

We do not agree that § 14(a) guarantees to supervisors the right to participate actively in a journeymen's union. Study of the views of the proponents and opponents of the Taft-Hartley Act, as expressed in Senate and House committee reports and in debates reported in the Congressional Record,* clearly indicates that it was the purpose of both the House bill (which did not contain § 14(a)) and of the Senate bill (which did contain § 14(a)) to prohibit association, for collective bargaining purposes, of supervisors and journeymen in the same union.

Whatever rights of membership are guaranteed by the statutes, those rights are clearly ancillary to the central right guaranteed to labor, the right to join to-

---

* 1 Legislative History of the Labor Management Relations Act (1947) 308, 363, 411, 501, 613, 647, 868, 893; 2 Leg.Hist. of the Labor Management Relations Act (1947) 1009, 1064, 1167, 1214, 1452, 1480, 1576, 1606.

gether for collective bargaining. We therefore hold that one who is barred from participating in collective bargaining in a particular union has no statutorily protected right to participate actively in that union. Since we have held above that participation by supervisors is "interference" unless protected by statute, and that such participation is not protected by statute, the action of the Board in these cases was proper.

## VII

In this case, as in Nassau, the Board permitted the supervisors to retain their union membership in order that they might protect their seniority and retain their fringe benefits. There is no express prohibition of this in the statute, and the legislative history contains no statement of intent to bar membership of supervisors in a journeymen's union provided they do not bargain collectively through the union and provided the supervisors are not covered by a union shop agreement through which they could lose their jobs as supervisors by being expelled from the union.

We expressly approve the Board's practice of permitting this retention of basic union membership. In an industry such as construction, there is extreme upward and downward flexibility in job positions. A man hired one week for one job as a foreman may very possibly be hired the next week on the next job as a journeyman. In view of this flexibility, not every supervisory employee is to be barred from active participation in a journeymen's union. We think that a careful reading of the Board's Nassau opinion shows that this problem is approached by the Board on a case-by-case basis.

■ We approve this approach. We think there is a real difference between merely attending meetings, on the one hand, and serving on the bargaining team, on the other; and the following considerations, while not intended to be all-inclusive, will generally serve as a guide toward reaching a decision as to whether action such as that taken in the instant cases is proper:

(1) The nature of the supervisory position; how completely the responsibilities of the particular position identify the holder of the position with management. Careful reference should be made to § 2(11),[2] bearing in mind that the definition therein contained was not intended to include "straw bosses" and leadmen. Such consideration is necessary because of the infinite possible variations in responsibilities enumerated in § 2(11).

(2) Apparent permanence of the supervisory position; how long the position has been held; how high it is in the company's hierarchy of supervisors. This is important because the degree of possibility of the employees' being hired later as a journeyman should have a direct bearing on his immediate right to participate in union affairs.

(3) The extent to which his position is properly included in or excluded from the bargaining unit. This is really a conclusion to be drawn from factor (1) above in the light of Section VI of this opinion.

From the foregoing factors, the Board can determine the extent of participation to be permitted in an individual case.

The Board's order, except as to McDonald, was clearly correct and should be enforced. With respect to McDonald, the proceeding should be remanded to the Board for reconsideration to determine whether, in the light of this opinion, his participation, by attending meetings and voting, is improper in view of his position in the respondent company. The Board's order is

Enforced in part; remanded in part.

2. Act of 1947.