298 F.2d 297
 INTERNATIONAL UNION OF UNITED BREWERY, FLOUR, CEREAL, SOFT DRINK AND DISTILLERY WORKERS OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Gulf Bottlers, Inc., Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
GULF BOTTLERS, INC., Respondent.
GULF BOTTLERS, INC., Petitioner
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 15759.
 No. 15929.
 No. 15988.
 United States Court of Appeals District of Columbia Circuit.
 Argued September 19, 1961.
 Decided November 9, 1961.
 Certiorari Denied April 9, 1962.
 
 See 82 S.Ct. 875.
 Mr. James C. Paradise, Cincinnati, Ohio, with whom Mr. Mozart G. Ratner, Washington, D.C., was on the brief, for petitioner in No. 15759.
 Mr. Lawrence J. Molony, New Orleans, La., of the bar of the Supreme Ct. of Louisiana, pro hac vice, by special leave of court, with whom Messrs. Rocco C. Siciliano and Charles A. Hobbs, Washington, D.C., were on the brief for respondent in No. 15929 and petitioner in No. 15988. Messrs. Rocco C. Siciliano and Charles A. Hobbs, Washington, D. C., entered appearances for intervenor in No. 15759.
 Mr. Melvin Pollack, Atty., National Labor Relations Board, with whom Messrs. Stuart Rothman, Gen. Counsel, National Labor Relations Board, Dominick L. Manoli, Assoc. Gen. Counsel, National Labor Relations Board, and Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, were on the brief, for respondent in Nos. 15759 and 15988 and petitioner in No. 15929.
 Before WILBUR K. MILLER, Chief Judge, and DANAHER and BASTIAN, Circuit Judges.
 DANAHER, Circuit Judge.
 
 
 1
 The Board[1] by its unanimous Decision and Order[2] adopted the findings and conclusions of the trial examiner with reference to certain unfair labor practices charged against Gulf Bottlers, Inc., the Employer.
 
 
 2
 Involved in the Union's petition, No. 15759, is an entity known as Gulf Bottlers Employees Association which the Board found had been formed with the assistance and support of the Employer. The Board's Order directed that the Employer withdraw and withhold all recognition from the Association unless and until the Association after a Board election shall have been certified as the bargaining representative of the employees. Meanwhile for the protection of the employees the terms and conditions of an outstanding contract with the Association were to be continued. The Union here asserts that the Board erred in failing to find that the Employer did not dominate the Association and further in not ordering that the Association be disestablished.
 
 
 3
 The Employer, in No. 15988, has challenged the Board's finding that the Association had been assisted in violation of sections 8(a) (2) and (1) of the Act.[3] The Employer further protests the Board's finding that two driver-salesmen had been discriminatorily discharged in violation of sections 8(a) (3) and (1) of the Act. The Employer contends that in any event the Board's order is without foundation on the ground that its various driver-salesmen were not entitled to the protection of the Act in that they were "supervisors," as defined in section 2 (11).[4]
 
 
 4
 The Board asks that its order be enforced in all respects.
 
 I — As to No. 15759
 Domination by the Employer
 
 5
 The Employer[5] distributes Pepsi-Cola and other bottled drinks in and about New Orleans over various routes which are serviced by some 36 or more driver-salesmen. The job of each such driver includes the driving of a truck, making deliveries to customers on his route, effectuating collections and assisting the customer in displaying merchandise. The driver-salesman also solicits new business and checks and hauls back to the plant the empty bottles. If he shall receive complaints from a customer he must, if possible, act upon them himself; otherwise he must submit the problem to his route manager. The exact status of this class of employee presents our principal problem, discussed in Part III. We turn first to the other issues.
 
 
 6
 In November 1958, Walker and Fazzio, the two alleged discriminatees, met with a union representative, arranged to undertake an organizing campaign and were supplied with union application cards. On December 6, 1958, the Union, claiming to represent a majority of the driver-salesmen, requested recognition. Two days later the petition for certification was sent to the Employer describing the unit as "All driver-salesmen, including full service drivers and their helpers * * *." but excluding "all other employees * * * and all supervisors as defined in the Act as amended." The Employer's President England on December 8, 1958 called Fazzio to his office and asked if he had signed a union card. Fazzio replied that he had not. England asked Fazzio to let him know if he heard anything about the Union. The following day he sent again for Fazzio. He wanted to know about the "gripes" which might be disturbing the men, adding that if Fazzio would let him know "of anybody else making mistakes, such as signing a union card," Fazzio would have his job then and ten years later.
 
 
 7
 On December 9, sales manager Weber told Walker that England wanted to see him. Did Walker "hear anything about any union activity going around?" Walker replied in the negative, but added that he would not inform England about union activity. England talked to all of the driver-salesmen seeking to ascertain whether or not they were "interested" in or had joined a union. On December 10, 1958, when the drivers reported for work they were called into the office. England wanted to know why they wanted a union and "what their gripes were." After discussion of terms and conditions of employment England asked the employees "to make a decision whether they wanted the union" or not. He sought to separate the employees into two groups, those for and those against a union. The meeting lasted several hours before England told Fazzio, who had been elected spokesman for the pro-union group, that "the routes won't go out today, tomorrow or any other day with you fellows. As of today, the plant is closed."
 
 
 8
 That night the men were requested to return to work on the following day. When they returned from their routes, having worked as usual, England talked to a group of the drivers suggesting that they form their own association to be called the Gulf Bottlers Employees Association, and that he could draw up a satisfactory contract. He told the group that they could get a lawyer and offered to pay one.
 
 
 9
 On December 12, 1958, various driver-salesmen, including Fazzio and Walker, were called to England's office where he talked about a contract with the proposed association. Shortly thereafter, the trial examiner and the Board found, England had his attorney draft a collective bargaining agreement which he requested the employees both individually and in groups to sign. Without further details, it is clear that various representations as to terms were made by England who sought to procure the signatures of the various driver-salesmen. All except Fazzio and Walker signed. One or two meetings of the thus recognized Association were held on company property. Before one such meeting commenced, England talked to the men but did not stay for the meeting. The Association elected its own officers and adopted a charter and by-laws. Thereafter, collecting dues and otherwise functioning through the procedures so created, the Association seems to have been controlled by the employees who were in position to and did operate their own organization. In January 1959, the Employer began deducting Association dues from the drivers' pay pursuant to their individual authorizations and the separate agreement with the Association.[6]
 
 
 10
 The agreement between the Employer and the Association, General Counsel's Exhibit 4, is before us. It comprises a fair labor-management contract with clauses providing for seniority rights, holidays, holiday pay, sick leave, vacations and many fringe benefits, arbitration and grievance clauses and other procedures.[7] Each driver-salesman was guaranteed that the total of his salary and commission would not be less than $75 per week.
 
 
 11
 On such facts, which are not the subject of real dispute, the trial examiner and the Board found, we think correctly, that the Employer had assisted in the formation of the Association. We have carefully considered the entire record and fail to find evidence which in any substantial degree lends support to the contention of the Union that the Employer dominated the Association after its formation or in any manner controlled its conduct. The Board did not err in failing to order disestablishment of the Association.[8] The Board's order on this aspect of the case must accordingly be affirmed.
 
 II — As to No. 15988
 Discrimination as to Fazzio and Walker
 
 12
 The Employer vigorously argues that Fazzio and Walker had been discharged for cause, thus challenging the findings of the examiner and of the Board that there had been unlawful discrimination. We have carefully explored the record and have fully considered the authorities which counsel so earnestly has urged as controlling.[9]
 
 
 13
 Our decisions must control[10] as we have applied the 1947 amendments which provide that "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." In Joy Silk Mills v. National Labor Relations Board[11] we said:
 
 
 14
 "The amendment, like its predecessor, does not permit the court to weigh evidence or to substitute its judgment for the Board's as to what conclusions are to be drawn from the evidence."
 
 
 15
 No great gain will flow from detailed particularization of the conflicting testimony on this aspect of the case. The trial examiner in controlling respects rejected the version submitted by England and expressly credited Fazzio and Walker. The Board adopted his findings and conclusions. It is clear that commencing in January, England, after seeking the advice of counsel, began to keep a record of alleged derelictions on the part of Fazzio and Walker. He prepared a memorandum of items of dereliction which he said were the basis for their discharge in February, 1959. The record shows that Walker in November, 1958, had threatened to resign but sales manager Weber had persuaded him to reconsider and to continue his employment. He was assured he was a "good man" who had "made more increase than most any man he had." It was not denied that Walker had been requested to remain in the company's employ. Charges against both Fazzio and Walker concerning, inter alia, shortages in their weekly returns lack something in significance when it is noted that the practice was general among the driver-salesmen and had persisted for a long period, but the Employer at all times had made up the shortages from the drivers' accrued earnings. The testimony showed "They hold a week back. Commission and salary is held back." Against background of such sort the examiner stated:
 
 
 16
 "In reaching the conclusion that Fazzio and Walker were actually discharged because of their union sympathies or activities, I do not do so on the basis of my appraisal of the weight or quality of such cause but on the basis that an appraisal of it in the light of the entire record shows that it is insincerely raised and was utilized as a pure pretext to mask Respondent's discriminatory purpose."[12]
 
 
 17
 Were we free to do so we might have concluded that Fazzio, at least, was discharged for cause rather than for labor union activity. We cannot say, however, that both the examiner and the Board could not have concluded otherwise. We are of the view that the issue comes squarely within the pronouncement of the Supreme Court in National Labor Relations Board v. Nevada Consol. Copper Co.[13]:
 
 
 18
 "Examination of the record discloses that there was substantial evidence from which the Board could have concluded that respondent's refusal to employ the men was motivated by its belief that they had engaged or threatened to engage in destruction of respondent's property and had threatened to injure some of respondent's managerial employees and members of their families. There was also substantial evidence from which the Board could have concluded, as it did, that respondent's motive for refusing the employment was discouragement of membership in a labor union. The possibility of drawing either of two inconsistent inferences from the evidence did not prevent the Board from drawing one of them, as the court below seems to have thought."
 
 
 19
 The Board has not been shown to have erred in concluding that the pro-union activity of Fazzio and Walker motivated their discharge. There was evidence of other possible grounds, as has been argued. Taking into account all items of fact heretofore recited and considering the record as a whole, we are persuaded we must affirm the order.[14]
 
 III — As to No. 15988 Supervisors
 Section 2(11) of the Act[15] provides:
 
 20
 "The term `supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." (Emphasis added.)
 
 
 21
 The trial examiner found that "the driver-salesmen are not supervisors within the meaning of the Act."[16] The Employer vigorously attacks that conclusion, insisting that the true effect of the 1947 amendment was "to deprive the Board of power to treat supervisory employees as employees"[17] entitled to the protection of the Act. Particularly it is insisted that an employee who is invested by the employer with any one of the 12 authorities enumerated in the section is a supervisor.[18] We are pointed to the "responsibly to direct" and "use of independent judgment" test said to have been applied to the facts in Ohio Power Co. v. N. L. R. B.[19]
 
 
 22
 This court early saw in section 2(11) an unmistakable congressional purpose to deny the benefits of the Act to "supervisors."[20] It was intended that the employer be given "a free hand to discharge foremen as a means of ensuring their undivided loyalty, in spite of any union obligations,"[21] we said in other context.
 
 
 23
 It has seemed to us that if a mere employee at some stage may become a supervisor, the transition becomes an actuality when he is found to possess real power "in the interest of the employer" to take meaningful action with respect to the statutory tests. It is not alone that he may hire or fire or lay off or discipline. He must do so in the interest of the employer. He must then, when acting, become in effect a part of management, not simply a lead man or straw boss. The entire work force from the president down to the messenger boy in one sense acts in the interest of the employer, as Congress well knew. Surely it contemplated some other test than is afforded by a sheerly literal reading of section 2 (11).
 
 
 24
 We recently spelled out various criteria to be applied by the Board in an individual, case-by-case approach.[22] We had in mind particularly that there must be a determination of status based upon the "nature" of the supervisory position and "how completely the responsibilities of the particular position identify the holder of the position with management," all "because of the infinite possible variations in responsibilities enumerated in § 2(11)."[23]
 
 
 25
 In Part I, supra, we outlined the duties of the driver-salesmen, each in charge of his own route. Before the prospect of a union developed, there was no requirement that a driver-salesman have a helper, indeed he could not have one unless he attained a basic quota of sales.[24] A helper, if engaged, was to assist the driver-salesman in any manner desired by the latter. The helper's chief service, however, was manual. He unloaded from the truck and moved full cases of beverage to the customer's premises whence he hauled out the empties and placed them on the truck. Some helpers separated bottles which had contained orange flavor from cola bottles and placed them in their proper boxes. The helper performed no work for the Employer other than on the truck under direction of the driver-salesman. "Although the Company pays the entire wage of the helper, as a practical matter $15 a week of that pay comes out of the pocket of the drivers since if they refrain from using a helper they get $15 extra pay," the trial examiner noted. The Employer simply added $12 more for the helper for a full week.
 
 
 26
 The helpers were described as generally illiterate employees, "scared colored men (and some were mere boys)" with a history of casual unstable employment. They were not permitted to come within the Employer's premises. They gathered each morning, if they desired work, outside the Employer's plant, there to be selected by a driver-salesman, but the latter might have selected a helper elsewhere. If none was chosen, a driver-salesman reported "no helper." Otherwise an income tax form was filled out and a record of actual service was compiled and turned into the office by the driver-salesman. The driver-salesman laid off his helper, made his own decisions in directing the manner and extent of the helper's service, and discharged him in some situations, as for "sassy" talk or actions which might dissatisfy a customer.
 
 
 27
 "There is no question, and I find, that the driver-salesmen at all times material herein who were entitled to have helpers, had and exercised the authority to hire, lay off or discharge those helpers," the examiner found. If that be so, the Employer argues, these driver-salesmen must be supervisors. Thus the charges against the Employer which involved alleged impairment of the rights of the driver-salesmen do not come within the jurisdiction of the Board.
 
 
 28
 We find ourselves unable to accept the Employer's contention, so earnestly presented. The whole purpose of section 2 (11) was to place into the employer category "those who acted for management not only in formulating but also in executing its labor policies."[25] We are satisfied that the examiner and the Board alike correctly interpreted as routine the extent of the driver-salesmen's direction of the helpers. That the latter in the circumstances described became employees is clear. That the driver-salesmen became supervisors is not. In no meaningful sense was their exercise of authority "in the interest of the employer." On the contrary, we see the record before us demonstrating that the driver-salesmen were motivated by and were acting in their own interest. Engaging the helpers had the effect of reducing the manual burdens of the driver-salesmen, expediting the service to their route customers, and increasing their potential for higher commissions, even to the point of their foregoing $15 each week which otherwise they would have received.
 
 
 29
 We are unable to accept the contention that the driver-salesmen were denying themselves the benefit of the Act. Their own responsibilities to the Employer were in nowise diminished. They were no more identified with management if they engaged helpers. With helpers or without, they were no less employees of the company, bound to execute its policies and to carry out the duties assigned to them, with no voice whatever in management except in their authority over a few casual employees selected at their own discretion. We conclude in light of the purposes of the amendment, and on the facts here, that these driver-salesmen were not deprived of their status as employees. And the Employer so treated them, assisted in the formation of their Employees Association and negotiated the agreement prescribing the terms and conditions of their employment. Considering the objectives of the Act as a whole,[26] they were entitled to its benefits. We find no error.
 
 IV — As to No. 15929 Conclusion
 
 30
 Accordingly the Board's order must be enforced. A decree will be submitted.
 
 
 
 Notes:
 
 
 [1]
 Acting by a division of three members as authorized by 29 U.S.C.A. § 153(b) (Supp. II, 1960)
 
 
 [2]
 127 N.L.R.B. 850 (1960)
 
 
 [3]
 29 U.S.C.A. §§ 158(a) (2), (1)
 
 
 [4]
 29 U.S.C.A. § 152(11). The text in full appears in Part III infra
 
 
 [5]
 Gulf Bottlers, Inc. employs a sales manager and five route managers who maintain supervision over several routes. The latter are not here involved, for it is beyond question that they acted in the interest of the Employer and clearly are "supervisors" within the meaning of the Act
 
 
 [6]
 Meanwhile, on December 16, 1958, the Union had again in writing requested recognition of a unit including the driver-salesmen and their helpers but excluding all supervisors and other employees of the company. At no time did the Employer reply to the Union's requests for recognition
 
 
 [7]
 Each driver-salesman, at his option, was to be allowed the use of a helper for the entire week. Until the formation of the Association, no driver-salesman was entitled to engage a helper unless he maintained a sales quota of not less than 800 cases per week
 
 
 [8]
 We deem reasonable and appropriate those particular portions of the Order precluding further recognition of the Association unless as a "labor organization" it shall have been certified as the exclusive representative of the included employees. National Labor Relations Board v. District 50, United Mine Workers, 355 U.S. 453, 458, 459, 78 S.Ct. 386, 2 L.Ed. 2d 401 (1958). Meanwhile the rights of the employees gained under the contract are not to be prejudiced
 
 
 [9]
 England in December, having become aware of union activity, sought the advice of counsel. Reasonably, the latter might have relied upon such cases as Sardis Luggage Co. v. National Labor Rel. Bd., 234 F.2d 190, 196 (5 Cir.1956); and see additionally, e. g., N. L. R. B. v. Red Wing Carriers, Inc., 284 F.2d 397 (5 Cir.1960); N. L. R. B. v. Birmingham Publishing Company, 262 F.2d 2, 8, 9 (5 Cir.1959); National Labor Relations Board v. McGahey, 233 F.2d 406, 410, 413 (5 Cir.1956)
 
 
 [10]
 The Union here filed No. 15759 only a week after the Board's Decision and Order had come down. The Employer, three weeks later, filed its petition in the Court of Appeals for the Fifth Circuit whence it was transferred to this Circuit pursuant to the provisions of 28 U.S.C. § 2112 (a) (1958). That the "race to the court house" has presented many problems is well known
 
 
 [11]
 87 U.S.App.D.C. 360, 366, 185 F.2d 732, 738 (1950), cert. denied 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951). And see News Printing Co. v. National Labor Relations Board, 98 U.S.App.D.C. 14, 17, 231 F.2d 767, 770, cert. denied 352 U.S. 845, 77 S.Ct. 33, 1 L.Ed.2d 47 (1956)
 
 
 [12]
 He relied upon such authorities as Wells, Inc. v. National Labor Relations Board, 162 F.2d 457, 460 (9 Cir.1947); National Labor Relations Board v. C. & J. Camp, Inc., 216 F.2d 113, 115 (5 Cir. 1954); the examiner was not unaware of his duty to ascertain the Employer's "real motive." Radio Officers v. Labor Board, 347 U.S. 17, 43, 74 S.Ct. 323, 98 L.Ed. 455 (1954)
 
 
 [13]
 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305 (1942)
 
 
 [14]
 Ore-Ida Potato Products, Inc. v. N. L. R. B., 284 F.2d 542 (9 Cir.1960); National Labor Relations Bd. v. Whitin Machine Works, 204 F.2d 883 (1 Cir.1953)
 
 
 [15]
 29 U.S.C.A. § 152(11)
 
 
 [16]
 The Board agreed, citing "Wells Dairies Cooperative, 109 NLRB 1450; Southern Bleachery and Print Works, Inc., 115 NLRB 787. See also N. L. R. B. v. Southern Bleachery & Print Works, 257 F.2d 235 (4th Cir.1958), enforcing 118 NLRB 299, cert. denied, 359 U.S. 911, [79 S.Ct. 588, 3 L.Ed.2d 575] (1959)." The examiner deemed the Wells Dairies case "controlling."
 
 
 [17]
 Eastern Coal Corp. v. National Labor Relations Board, 176 F.2d 131, 136 (4 Cir. 1949)
 
 
 [18]
 National Labor Relations Bd. v. Edward G. Budd Mfg. Co., 169 F.2d 571, 576 (6 Cir.), cert. denied sub nom. Foreman's Association of America v. Edward G. Budd Manufacturing Co., 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441 (1948); also cited to us is National Labor Relations Bd. v. Whitin Machine Works, supra note 14, 204 F.2d at 886. But see National Labor Relations Bd. v. Quincy Steel Cast. Co., 200 F.2d 293, 296 (1 Cir.1952) and National Labor Relations Board v. Leland-Gifford Co., 200 F.2d 620, 625 (1 Cir.1952) wherein the First Circuit reflects its conclusion that an employee may be classified as a "supervisor" when he has "actually been clothed with genuine power to perform a supervisory function"; possession of "real power," not its exercise, is the criterion
 
 
 [19]
 176 F.2d 385, 387, 388, 11 A.L.R.2d 243 (6 Cir.), cert. denied 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553 (1944); cf. National Labor Relations Bd. v. Whitin Machine Works, supra note 14, 204 F.2d at 886
 
 
 [20]
 L. A. Young Spring & Wire Corp. v. National Labor Rel. Bd., 82 U.S.App.D.C. 327, 328, 163 F.2d 905, 906 (1947), cert. denied sub nom. Foreman's Association of America v. L. A. Young Spring & Wire Corp., 333 U.S. 837, 68 S.Ct. 607, 92 L. Ed. 1121 (1948). Our note 2 there reflected the genesis of the congressional reasoning which predicated the amendment. Congress had in mind supervisory personnel traditionally regarded as part of management
 
 
 [21]
 Carpenters District Council, Etc. v. N. L. R. B., 107 U.S.App.D.C. 55, 57, 274 F. 2d 564, 566 (1959). There is no problem in the case of one who is actually a foreman. But the relevant position is not always as clearly defined. That the question involves various gradations of status may be seen from the following: National Labor Relations Board v. Swift & Company, 240 F.2d 65 (9 Cir.1957); National Labor Relations Board v. Osbrink, 218 F.2d 341, 343, 344 (9 Cir.1954), cert. denied, 349 U.S. 928, 57 S.Ct. 770, 99 L.Ed. 1259 (1955); National Labor Relations Bd. v. Parma Water Lifter Co., 211 F.2d 258, 260, 261 (9 Cir.), cert. denied, 348 U.S. 829, 75 S.Ct. 51, 99 L.Ed. 654 (1954); Precision Fabricators v. National Labor Relations Bd., 204 F.2d 567, 568, 569 (2 Cir.1953); National Labor Rel. Bd. v. North Carolina Granite Corp., 201 F.2d 469 (4 Cir.1953)
 Where to draw the line is the constantly recurring problem, with the reported cases shedding scant light on the situation here. See additionally, National Labor Rel. Bd. v. Beaver Meadow Creamery, 215 F.2d 247, 251, 252 (3 Cir.1954).
 
 
 [22]
 Local 636, Etc., Plumbing & Pipe Fit. Ind. of U. S. v. N. L. R. B., 109 U.S. App.D.C. 315, 323, 287 F.2d 354, 362 (1961)
 
 
 [23]
 Ibid
 
 
 [24]
 After the December 10th meeting, England abolished the quota requirement
 
 
 [25]
 Mr. Justice Douglas dissenting in Packard Co. v. Labor Board, 330 U.S. 485, 496, 67 S.Ct. 789, 795, 91 L.Ed. 1040 (1947). Stated in different context to be sure, but nevertheless apt, his observations and the opinion of the Court underlay the 1947 amendment. See L. A. Young Spring & Wire Corp. v. National Labor Rel. Bd., supra note 20
 
 
 [26]
 Cf. C. I. R. v. Bilder, 289 F.2d 291, 298, 302 (3 Cir.1961)
 
 
 
 31
 WILBUR K. MILLER, Chief Judge (concurring in part and dissenting in part).
 
 
 32
 As to case No. 15,759, which is discussed and decided in Part I of the foregoing opinion, I concur in the court's conclusion that the Board did not err in failing to direct the disestablishment of the Gulf Bottlers Employees Association, and that its order giving effect to its conclusion should be upheld. I dissent, however, from Parts II and III of the majority opinion which deal with case No. 15,988, as I think Fazzio and Walker were legally discharged for cause, and that the driver-salesmen were supervisors within the meaning of Section 2(11) of the Act. It follows, of course, that I dissent also from Part IV of the majority opinion which orders enforcement of the Board's order against Gulf Bottlers, as sought by the Board in case No. 15,929.
 
 
 33
 In the course of Part II of their opinion dealing with the discharge question, the majority quote the following statement of the examiner as to why he concluded the dismissals were discriminatory:
 
 
 34
 "* * * In reaching the conclusion that Fazzio and Walker were actually discharged because of their union sympathies or activities, I do not do so on the basis of my appraisal of the weight or quality of such cause but on the basis that an appraisal of it in the light of the entire record shows that it is insincerely raised and was utilized as a pure pretext to mask Respondent's discriminatory purpose."
 
 
 35
 This statement, approved by the Board, shows the examiner did not consider the "weight or quality" of the employer's evidence that the men had been discharged for good cause, but ignored it because he thought the employer also had a discriminatory purpose on account of their union activity. To conclude as he did, I think the examiner would have had to find from the evidence as a whole that the cause for dismissal given by the misconduct of the two men played no part in their discharge, or that it was so weak and unconvincing that union activity was in truth the real motive. In the face of strong and convincing evidence of improper conduct that was legal warrant for discharge, it was impossible, I think, for the examiner to make either of these two findings. In fact, he made neither: he simply said the evidence of legal cause, no matter how great in "weight" nor how fine in "quality," was not to be considered because the men had engaged in union activity of which the employer did not approve.
 
 
 36
 These two motives for a discharge are not necessarily inconsistent; they are not mutually exclusive. Surely it is not the law that an employer must retain an employee whose insubordinate conduct constitutes legal cause for dismissal, merely because the employee has engaged in union activity with which the employer was not in sympathy. I think the Board erred in approving the examiner's finding of illegal discharges, when it was reached by unlawfully and totally ignoring the evidence presented by the employer.
 
 
 37
 I disagree with Part III of the majority opinion because I think the driver-salesmen were supervisors within the literal meaning of Section 2(11) of the Act. I do not believe any court has the right to rewrite the section in order to exclude from its scope a class which is clearly within its terms. There is no requirement that the Act apply to all workers, regardless of their status.
 
 
 38
 As I have indicated, my dissent from Parts II and III of the opinion, which reject Gulf Bottlers' attack on the order, sufficiently explains why I dissent from Part IV, which enforces the Board's order against Gulf Bottlers.