### NATIONAL LABOR RELATIONS BOARD

v.

### BEAVER MEADOW CREAMERY, Inc.

### No. 11236.

United States Court of Appeals, Third Circuit.

Argued May 17, 1954.

Decided Aug. 16, 1954.

Melvin Spaeth, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Arnold Ordman, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Frank G. Smith, Clearfield, Pa. (Frank A. Whitsett, Clearfield, Pa., Smith, Maine, Whitsett & Lee, Clearfield, Pa., on the brief), for respondent.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

The National Labor Relations Board petitions for enforcement of that part of its order requiring the respondent company to cease and desist from the commission of certain unfair labor practices found and from in any other manner violating rights guaranteed its employees by Section 7 of the Labor Management Relations Act, 29 U.S.C.A. § 157, to make whole one DeLarme for the period from the time of his discharge to September 23, 1951, the time of his receipt of the company's offer of reinstatement, and to post the usual notices.[1]

The testimony credited by the trial examiner and the board supports the following account of what happened.

The company is engaged in the dairy business in DuBois, Pennsylvania. In early September of 1951, the employees began discussing the formation of a union. DeLarme, an employee in the egg room and whose discharge is here in issue, met with a representative of the United Construction Workers on September 6, 1951. The two men talked over organizational procedure, and DeLarme obtained a supply of union application cards. At noon on the following day, he and three other employees met, signed application cards, and decided to call an organizational meeting that evening. To conceal the purpose of the meeting from management ears, they told the invitees that the purpose of the meeting was to plan a party for plant superintendent Brennan. The ruse failed, however, for later that afternoon, Kirk, the company president, told Brennan that " * * * there is a union afoot here * * *," that DeLarme was the "instigator" and that Brennan was to fire him " * * * under the pretense that we had too many complaints on eggs." Kirk also instructed Brennan to inform the employees that there would be no "party" that evening. Brennan so notified the employees and discharged DeLarme, telling him that there were too many complaints on eggs. On September 21, DeLarme filed the charge which initiated this proceeding.

We are met at the threshold by a point that goes to the validity of the entire order. The union man that DeLarme met on September 6 was a field representative of the United Construction Workers, affiliated with the United Mine Workers of America, District 50. Furthermore, in the charge filed by DeLarme, it is alleged that he was discharged because of his activities in behalf of the United Construction Workers. It is conceded that the affiliate labor organization is not in compliance with the filing requirements of subsections (f), (g), and (h) of Section 9 of the Act.[2] These subsections condition resort to board processes by labor organizations upon their filing certain financial and operational data and their officers filing non-communist affidavits. From this

---

1. 103 N.L.R.B. 1504 (1953).

2. 49 Stat. 453 (1935), as amended, 65 Stat. 601 (1951), 29 U.S.C.A. § 159(f), (g), and (h).

the company argues that the board's order is invalid because based upon a complaint which is in turn based upon a charge that was filed by a noncomplying union. The heart of the argument is that, although the charge was signed by DeLarme as an individual, he was really "fronting" for the United Construction Workers, which body was not in compliance with the Act.

The facts do not support such a contention. The company concedes, as of course it must, that subsections (f), (g), and (h) of Section 9 have nothing to do with the case of an individual's filing a charge in his own right, seeking redress for unfair labor practices directed against him.[3] A labor organization's noncompliance with the Act's filing requirements would preclude the board's entry upon the scene only if the charging party, as the board has put it, were " * * * acting as a representative of the noncomplying union so that his charges were merely a device whereby the Union could avoid complying and yet seek by subterfuge to reap the benefits of the Act." Wood Parts, Inc., 101 N.L.R.B. 445, 446 (1952). There is no indication that any such trickery has occurred in this case. Here the alleged dischargee filed the charge, alleging in the first paragraph a wrongful termination of his own employment and, in the second, interference, coercion, and restraint directed against him alone. Hence, the charge was limited entirely to his own individual grievances. It was not expanded to cover alleged wrongs done to other employees or to the noncomplying union as an entity as it would have been had DeLarme been acting as agent for the union. The charge does state that DeLarme was discharged because of his membership in and activities in behalf of the United Construction Workers, but we make nothing of that since it would be practically impossible, when alleging a discharge because of union activities, to avoid naming the union on whose behalf the activities were engaged in. Indeed, the board's form directs the charging party to "Be specific as to facts, names, addresses, plants involved, dates, places, etc." The company makes much of the fact that DeLarme had quite an active part in the employees' organizational activities. That is true but not of itself decisive. From a consideration of all the evidence, it is abundantly clear that in filing the charge DeLarme was acting on his own behalf and not as an agent for the noncomplying union.[4]

The cease and desist order does not name the noncomplying union or any specific union, nor does the notice required to be posted. This dissipates whatever force there might have been to the company's argument that the order confers substantial benefit upon a noncomplying union and requires the company to recognize it.[5]

The reason assigned for DeLarme's discharge was his alleged inefficiency. The board found, however, in agreement with its trial examiner, that

3. National Labor Relations Board v. Clausen, 3 Cir., 188 F.2d 439, certiorari denied, 1951, 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 653.

4. National Labor Relations Board v. L. Ronney & Sons Furniture Mfg. Co., 9 Cir., 1953, 206 F.2d 730, certiorari denied, 1954, 346 U.S. 937, 74 S.Ct. 377; Southern Furniture Mfg. Co. v. National Labor Relations Board, 5 Cir., 194 F.2d 59, certiorari denied, 1952, 343 U.S. 964, 72 S.Ct. 1057, 96 L.Ed. 1361; National Labor Relations Board v. Globe Wireless, Ltd., 9 Cir., 1951, 193 F.2d 748, 749 note 1; W. T. Rawleigh Co. v. National Labor Relations Board, 7 Cir.,

1951, 190 F.2d 832; National Labor Relations Board v. Clausen, 3 Cir., 188 F. 2d 439, certiorari denied, 1951, 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 653; National Labor Relations Board v. Augusta Chemical Co., 5 Cir., 1951, 187 F.2d 63.

National Labor Relations Board v. Happ Bros. Co., 5 Cir., 1952, 196 F.2d 195, and National Labor Relations Board v. Alside, Inc., 6 Cir., 1951, 192 F.2d 678, are not to the contrary but are factually distinguishable.

5. See W. T. Rawleigh Co. v. National Labor Relations Board, 7 Cir., 1951, 190 F.2d 832, 836–837.

the real reason for the discharge was the company's disapproval of DeLarme's efforts to organize a union to represent the employees. The conclusion was that this was a discriminatory discharge in violation of Section 8(a) (3) and (1) of the Act.[6] This question of the true motivation for the discharge was for the trier of fact, and, although there was conflicting testimony, the evidence on the record considered as a whole substantially supports the conclusion drawn. Hence, it must stand here.[7]

The company's principal defense to any finding of an unfair labor practice based upon DeLarme's discharge is that he is not entitled to the protection of the Act because he was a supervisor within the meaning of Section 2 (11) and thus was not an employee within Section 2(3).[8] On the contrary, we think the board was completely justified in accepting the trial examiner's findings and conclusions regarding DeLarme's status. Among the myriad rank-and-file duties performed by DeLarme, the strongest ones in favor of the company's contention are that he checked out eggs to the driver-salesmen, kept a record of eggs on hand and turned it over to a bookkeeper, and instructed new girls in how to candle and grade eggs. From all the evidence, the trial examiner concluded that DeLarme was not a supervisor but was, at most, a "lead man." That was not only a permissible conclusion but was just about the only conclusion that this record could support. We quite agree that Section 2(11) must be read disjunctively, that the possession of any one of the Section 2(11) powers will make one a supervisor,[9] and that it is the fact of possession of the power regardless of its nonexercise that is determinative.[10] But we do not see that this helps the company here since DeLarme had no Section 2(11) authority to exercise. We think his standing in the labor force was the same as or lower than that of those involved in the cases in the footnote, all of whom were held not to be supervisors.[11] It is quite clear that he had no

6. "Unfair labor practices.
   "(a) It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   *    *    *    *    *    *
   "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *." 49 Stat. 452 (1935), as amended, 65 Stat. 601 (1951), 29 U.S.C.A. § 158(a) (1) and (3).

7. 48 Stat. 926 (1934), as amended, 63 Stat. 107 (1949), 29 U.S.C.A. § 160(e); Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

8. "Definitions.
   "When used in this subchapter
   *    *    *    *    *    *
   "(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."
   "(3) The term 'employee' * * * shall not include * * * any individual employed as a supervisor * * *." 49 Stat. 450 (1935), as amended, 61 Stat. 137 (1947), 29 U.S.C.A. § 152(11) and (3).

9. National Labor Relations Board v. Whitin Machine Works, 1 Cir., 1953, 204 F. 2d 883; Ohio Power Co. v. National Labor Relations Board, 6 Cir., 176 F.2d 385, 11 A.L.R.2d 243, certiorari denied, 1949, 338 U.S. 899, 70 S.Ct. 249, 94 L. Ed. 553; National Labor Relations Board v. Edward G. Budd Mfg. Co., 6 Cir., 1948, 169 F.2d 571, certiorari denied, Foreman's Ass'n of America v. Edward G. Budd Mfg. Co., 1949, 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441.

10. National Labor Relations Board v. Leland-Gifford Co., 1 Cir., 1952, 200 F.2d 620; Ohio Power Co. v. National Labor Relations Board, supra note 9.

11. National Labor Relations Board v. Parma Water Lifter Co., 9 Cir., 1954, 211 F.2d 258; National Labor Relations Board v. Whitin Machine Works, 1 Cir.,

such authority as did the control operators in Ohio Power Co. v. National Labor Relations Board, 6 Cir., 176 F.2d 385, 11 A.L.R.2d 243, certiorari denied, 1949, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553, the case relied upon by the company.

In addition to the discharge of DeLarme, the board found that the company had committed independent violations of Section 8(a) (1) by interrogating two employees concerning their union activity, attempting to call off the organizational meeting, and threatening economic strikers with discharge before they had been replaced unless they returned to work by a certain date.

■ The interrogation matter does not require extended discussion. Kirk, the company president, asked employee Syphrit whether he had joined the union. Syphrit denied that he had, although he had in fact signed an application card. Kirk then told him that as long as he "stayed away from the union" he and "a few others would have a job" as long as they wanted but that "the others will just come and go." Such interrogation of employees regarding union activity coupled with a clear threat of economic reprisal is an obvious violation of Section 8(a) (1).[12] This was only one of several violations of the Act and, therefore, the company's argument that a board order should not be enforced when based upon a single, isolated dereliction is inapplicable. Since the unlawful interrogation of Syphrit is sufficient to support the pertinent part of the cease and desist order, we need not pass upon the question whether Kirk's interrogation of employee

Shugarts and his offer to recommend Shugarts for membership in the local country club was such a promise of benefit as to violate Section 8(a) (1).

■ When the employees became dissatisfied with the progress of negotiations, they went on strike on September 19, 1951, and stayed out till about the middle of November. There is no dispute that this was an economic strike. The day after the strike started, the company distributed a letter to its striking employees, the last paragraph of which follows:

"The plant is ready to operate if and when you choose to return to work. If you do not return to work on or before September 24th, 1951, we will consider you to have terminated your employment with this Company."

The next day a second letter was distributed, stating that the company would recognize and negotiate with the union were it to be certified by the Pennsylvania Labor Relations Board. The last paragraph of this letter informed the striking employees that this offer was conditioned as follows:

"This is on condition that you return to work on or before September 24, 1951, and if the plant is not opened by that time, there will be few, if any jobs there, so, if the subject matter is not determined promptly, it makes little difference."

These letters constituted interference and coercion in violation of Section 8(a) (1).[13] We think the sense of the two

1953, 204 F.2d 883; Precision Fabricators, Inc., v. National Labor Relations Board, 2 Cir., 1953, 204 F.2d 567; National Labor Relations Board v. North Carolina Granite Corp., 4 Cir., 1953, 201 F.2d 469; National Labor Relations Board v. Quincy Steel Casting Co., 1 Cir., 1952, 200 F.2d 293; Red Star Exp. Lines of Auburn, Inc. v. National Labor Relations Board, 2 Cir., 1952, 196 F.2d 78.

12. H. J. Heinz Co. v. National Labor Relations Board, 1941, 311 U.S. 514, 61

S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Nina Dye Works Co., 3 Cir., 203 F.2d 849, certiorari denied, 1953, 346 U.S. 875, 74 S.Ct. 127; National Labor Relations Board v. Kanmak Mills, Inc., 3 Cir., 1952, 200 F.2d 542.

13. Cusano v. National Labor Relations Board, 3 Cir., 1951, 190 F.2d 898; National Labor Relations Board v. Electric City Dyeing Co., 3 Cir., 1950, 178 F.2d 980.

paragraphs quoted above goes beyond that sanctioned in Kansas Milling Co. v. National Labor Relations Board, 10 Cir., 1950, 185 F.2d 413.

The order of the board will be enforced. A proposed decree may be submitted.