**NEWS PRINTING COMPANY, Inc.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 12619.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 12, 1955.

Decided March 8, 1956.

Wilbur K. Miller, Circuit Judge, dissented.

Mr. Charles A. Horsky, Washington, D. C., with whom Mr. Jerome Ackerman, Washington, D. C., was on the brief, for petitioner.

Mr. Samuel M. Singer, Attorney, National Labor Relations Board, of the bar of the Court of Appeals of New York, *pro hac vice,* by special leave of Court, with whom Mr. Marcel Mallet-Prevost, Assistant General Counsel, National La-bor Relations Board, was on the brief, for respondent. Mr. Robert G. Johnson, Attorney, National Labor Relations Board, also entered an appearance for respondent.

Before PRETTYMAN, WILBUR K. MILLER and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

Petitioner attacks and the Board asks enforcement of its order providing in part that petitioner "cease and desist from * * * discouraging membership in any labor organization by discriminatorily discharging employees * * *."[1] The General Counsel's consolidated amended complaint alleged violations of §§ 8(a) (1) and 8(a) (3) of the Labor Management Relations Act[2] and was based upon charges filed by nine employees. Petitioner contended before the Trial Examiner that the Board lacked jurisdiction to act on the charges because the individual charging parties were allegedly "fronting" for International Typographical Union and its Local 195 which had failed to meet the filing requirements of Section 9 of the Act, and because the charge filed by one Kolanko was barred by Section 10(b)[3] of the Act. Such claims are here renewed, coupled

1. The findings of fact, conclusions of law, and order of the Board are reported at 110 N.L.R.B. 1265 (1954). Excerpted or paraphrased from the order is pertinent language:

"Cease and desist from:

"(a) Discouraging membership in any labor organization of its employees by discriminatorily discharging employees, or by discriminating in any other manner in regard to their hire and tenure of employment or any term or condition of employment, or by threatening them with loss of employment or other economic reprisal if they join or assist any labor organization;

"(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to join or assist any labor organization * * * or to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized in Section 8(a) (3) of the Act."

Affirmatively the petitioner was ordered to offer reinstatement to three employees; to make whole six employees for any loss of pay suffered by reason of discrimination against them; "in a nondiscriminatory manner assign employees to the third shift, reassigning if necessary any of those now on the third shift"; and to post notices reciting the effectual results of the Board's order, as above.

2. Act of June 23, 1947, 61 Stat. 140, as amended, 65 Stat. 601 (1951), 29 U.S. C.A. § 151 et seq.

3. § 10(b) provides in pertinent part that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board * * *."

with the claim that the findings lack substantial support in the record as a whole.

■ The Union and its Local failed to meet the filing requirements of the Act.[4] The Act, however, does not command compliance by a labor organization. It simply denies to a non-complying union access to the Board's processes, as may be noted from pertinent language: "No investigation shall be made by the Board * * * and no complaint shall be issued pursuant to a charge made by a labor organization * * * unless such labor organization * * * shall have * * * filed" specified information.[5] Of course, the courts will not enforce an order based upon a proceeding the Board is forbidden to conduct.[6] A charge may be filed even by a non-complying union, and if it later, under the Board rules, comes into compliance status, the Board may go forward.[7]

■ Certainly employees *acting individually* may assert their own rights before the Board irrespective of the requirements of § 9(f), (g) and (h), whether they are members of a labor organization[8] or not, and even though they be members of a non-complying union.[9] Petitioner assails the principle so stated, insisting that the Board should refuse to entertain unfair labor practice charges where a remedial order, even though limited to the charging individuals, would redound to the benefit of a non-complying union.[10] Cases have recognized that some incidental benefit may possibly flow to a non-complying union when, as here, the Board issues a complaint based upon a charge by an individual. Whether the individual acts in good faith or whether his filing is a mere subterfuge becomes a question of fact. Even the Happ and Alside cases demonstrate that whether the Board's processes are fraudulently abused turns on the factual situation. And it must be so that individual employees are to be protected in their right to self-organization, § 7, and interference with that right, § 8(a)(1), or discrimination because of its exercise, § 8(a)(3), when proved, will call for a Board determination that unfair labor practices have been resorted to. This was true before § 9(f), (g) and (h) were adopted, and it is true now. Here the Board adopted, with certain modifications, the findings, conclusions

4. § 9(f), (g) and (h).

5. § 9(f); similarly, "No labor organization shall be eligible for certification * * * and no complaint shall issue * * *." unless there be compliance under § 9(g); and see non-Communist affidavit requirement of § 9(h).

6. National Labor Relations Board v. Highland Park Co., 1951, 341 U.S. 322, 325, 71 S.Ct. 758, 95 L.Ed. 969; cf. National Labor Relations Board v. Coca-Cola Bottling Co., 1956, 350 U.S. 264, 76 S.Ct. 383.

7. National Labor Relations Board v. Dant, 1953, 344 U.S. 375, 382, 73 S.Ct. 375, 97 L.Ed. 407.

8. See § 2(5) defining "labor organization."

9. N. L. R. B. v. Beaver Meadow Creamery, 3 Cir., 1954, 215 F.2d 247, 249–250; N. L. R. B. v. Pecheur Lozenge Co., 2 Cir., 1953, 209 F.2d 393, 403, certiorari denied, 1954, 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1099; N. L. R. B. v. L. Ronney & Sons Fur Mfg. Co., 9 Cir., 1953, 206 F. 2d 730, 732, certiorari denied, 1954, 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425; N. L. R. B. v. Coal Creek Coal Co., 10 Cir., 1952, 204 F.2d 579, 582; Southern Furniture Mfg. Co. v. N. L. R. B., 5 Cir., 1952, 194 F.2d 59, 61, certiorari denied, 343 U.S. 964, 72 S.Ct. 1057, 96 L.Ed. 1361; N. L. R. B. v. Globe Wireless, 9 Cir., 1951, 193 F.2d 748, 749 note 1; N. L. R. B. v. Clausen, 3 Cir., 1951, 188 F. 2d 439, 443, certiorari denied, 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 653; N. L. R. B. v. Augusta Chemical Co., 5 Cir., 1951, 187 F.2d 63, 64.

10. Petitioner relies notably upon N. L. R. B. v. Alside, Inc., 6 Cir., 1951, 192 F.2d 678; N. L. R. B. v. Happ Bros. Co., 5 Cir., 1952, 196 F.2d 195. But in Alside, the complainant represented himself and some sixty others as members of a named labor organization. The court said the situation was as though the charge had been made by the union and signed by the complainant as president. So in the Happ case, the union president filed for herself and 95 others.

and recommendations of its Trial Examiner. It was specifically found that there was no "fronting." After reviewing the record as a whole, we conclude that the findings are supported by substantial evidence, and the findings must stand.[11]

Petitioner is the publisher of the Paterson (N.J.) Evening News. Local 195 of the International Typographical Union was engaged, at the times involved here, in an organizational campaign affecting the employees of the Morning Call, also of Paterson. Admittedly, neither the Local nor the International had filed § 9 compliance affidavits. One Earl J. Fisher employed as superintendent of petitioner's composing room "was in complete control and the composing room was his domain." He was "the focal point around which all the charges center, they all involve either his statements or his actions." Fisher sat with counsel at all times, the "Intermediate Report" notes, and heard all testimony. Still, in several important instances, he was found to be vague; he offered evidence which was effectively contradicted; having been confronted with testimony contrary to his own, he later asked and was given permission to change his testimony; indeed he produced an exhibit which the Trial Examiner described as "not only self-serving in the circumstances, but decidedly suspect." The Examiner summed up:

"After reading the entire record, and observing the demeanor of Fisher as a participant and witness throughout the case and particularly in his final testimony, I am convinced and find that Fisher has slanted and colored his testimony regardless of fact and truth, and is entirely unworthy of belief as to controversial matters herein, and that in all instances where his veracity is involved, in direct opposition to that of other credible witnesses, his tes-

timony should not be credited and will not be by me." [12]

On the other hand, there were repeated instances of coercion or threats attributed to Fisher. "They did not want anything to do with the Union in that place," he was said to have said. "If I wanted to become a union member I would have to go elsewhere to work because this shop would never be union," another was told. "If you get a union in here you will be responsible for people losing their jobs." "He knows about who belongs to the union, and that we are going to have a meeting, that night, and Mr. Haines said that anyone who attends that meeting is finished as of tomorrow. He will take his chances with the Labor Board."

█ And so the record goes. Without our going into the infinite detail of charge and countercharge, it is clear that there is substantial evidence of record to support the findings that Kolanko, Mamary and Huebner were discriminatorily discharged and that employees Meier, Hutton, Solinger, Pavlick, Bowman and Carruth were discriminated against in the terms and condition of their employment because of their membership in or activity on account of the union. Without dissent the Board upheld the Trial Examiner, and we cannot say the Board erred.

█ Petitioner urges that, in any event, the Board erred in finding that § 10(b), note 3 supra, did not bar issuance of a complaint with respect to Kolanko's discharge which occurred April 26, 1952. Two days later he filed a charge with the Board alleging discrimination. Early in April 1952, he had signed a union application, and was active thereafter in soliciting other employees to join although he was not himself a member at the time. The charge was properly served and never withdrawn, the Examiner found. On September 10, 1952, Kolanko filed a first amended charge, detailing

11. Radio Officers' etc. v. National Labor Relations Board, 1954, 347 U.S. 17, 33, 74 S.Ct. 323, 98 L.Ed. 455.

12. 110 N.L.R.B. 1265, 1281 (1954).

several allegedly unfair labor practices but, this time, omitting any specific allegation of discriminatory discharge. The Board's original complaint was issued January 6, 1953, and although petitioner alleges the complaint failed to make reference to the discharge, Kolanko clearly appears as one of the charging parties. Moreover the first paragraph of the complaint recites that a copy of the "charge filed by Norman Kolanko in Case No. 2–CA–2471 was served by registered mail upon Respondent on April 30, 1952." In any event, on February 16, 1953, Kolanko filed a second amended charge which included an allegation as to discriminatory discharge. The Board thereupon amended its complaint on February 19, 1953, accordingly.

The issue said to arise from these facts turns on whether Kolanko's original charge was withdrawn by his filing his first amended charge, for, if so, clearly, the *second* amended charge was filed well after the six-months period following the April 26th discharge, the unfair labor practice complained of.

Petitioner relies upon Indiana Metal Products Corp. v. N. L. R. B., 7 Cir., 1953, 202 F.2d 613, 619. There the court having stated the rule, specifically found that " * * * each event was subsequent to the filing and the serving of the first charge and more than six months prior to the filing and serving of the amended charge." Hence, with respect to such events, there never was a charge upon which jurisdiction could be based. In the instant case a timely charge was made and served.

There was no showing that Kolanko's charge had been withdrawn by consent. Unless it had been dismissed by the Board or withdrawn by consent pursuant to the Rule,[13] Kolanko's charge was before the Board or its appropriate officials at all times. The original complaint may be amended at any time prior to the issuance of an order based thereon, as § 10(b) expressly provides. Thus the Board's amended complaint, making a specific allegation with reference to Kolanko's discharge based upon his still pending charge, was valid and sufficient even if he had never filed his second amended charge. There is no requirement that the complaint be issued within six months of the unfair labor practice charged.[14] Petitioner's contention must be overruled.

■ Finally, petitioner asks us to modify the Board's order and to mitigate any possible benefit to the non-complying union by selected language to be included in the notice. It recognizes that the Board is authorized by § 10(c) "to take such affirmative action * * * as will effectuate the policies of" this Act. It argues, however, that denial of benefits to non-complying unions is now part of the policy of the Act. Thus, petitioner continues, neither the order nor the notice should be open to the inference that the order results from the efforts of the union or that any benefit is being conferred upon the union, or that the employer is to be required to deal with the union.

There is much to be said for petitioner's point, but its proposed remedy goes much too far. The Board's order properly commanded the employer to cease and desist from discouraging membership "in any labor organization," or from interfering with the employees in the exercise of their right to join or assist

13. Rules and Regulations, series 6, as amended, Sec. 102.9; 29 C.F.R. § 102.9 (Supp.1954) provides in part, " * * * Any such charge may be withdrawn, prior to the hearing, only with consent of the regional director with whom such charge was filed; at the hearing and until the case has been transferred to the Board pursuant to § 102.45, upon motion, with the consent of the trial examiner designated to conduct the hearing; and after the case has been transferred to the Board pursuant to § 102.45, upon motion, with the consent of the Board."

And see Radio Officers v. National Labor Relations Board, supra note 11, 347 U.S. at page 34, note 30, 74 S.Ct. 332; N. L. R. B. v. Wemyss, 9 Cir., 1954, 212 F.2d 465, 468; N. L. R. B. v. Kobritz, 1 Cir., 1951, 193 F.2d 8, 15–16.

14. § 10(b); and see N. L. R. B. v. Kobritz, note 13 supra, 193 F.2d at page 16.

a labor organization. The protection of the § 7 rights of the individual complainants requires at least that much. Moreover, the § 7 rights "to form, join, or assist labor organizations" are not limited to labor organizations which are in compliance status. A labor organization as defined in § 2(5) may take any of several forms, or may have achieved varying degrees of development or be in a partial stage of compliance. Even a non-complying union may file a charge but come into compliance before a complaint be issued.[15] Section 10(c) authorized the Board to command the employer to cease and desist from the unfair labor practices found. Reference to note 1, supra, will disclose that the Board further ordered the employer "to take such affirmative action" as was necessary to effectuate the policy of the Act. But we are not without responsibility, nor do we lack authority when we have taken jurisdiction of the proceeding. Section 10(e) empowers us to make and enter "a decree enforcing, modifying, and enforcing as so modified * * * the order of the Board." The Board has properly sought to vindicate the § 7 rights of the individual charging employees. We are satisfied that the Board has no desire to permit a non-complying union to achieve by indirection what it could not accomplish directly because of its refusal to comply with § 9(f), (g) and (h) requirements. The Court has hitherto modified language of a notice which implied the employer was confessing a violation of the Act.[16] In the circumstances of a case before it, the Seventh Circuit decided that both the order and the notice should be modified by elimination of all specific references to a named non-complying union.[17] We will not say that there has been an abuse of the Board's discretion in the language appearing in the *order*.[18] But we are equally of the view that the policies of the Act will be effectuated by elimination from the order of the requirement of paragraph 2(c) concerning posting of the notice, Appendix A, as presently worded. Therefore we will modify the order in respect to the content of the notice so that Appendix A will read as is set forth in the margin.[19]

The Board's order, modified as hereinbefore set forth, will be enforced.

So ordered.

WILBUR K. MILLER, Circuit Judge (dissenting).

I should be in full agreement with the majority opinion except for my conviction that the respondent lacked jurisdiction because the complaining employees were "fronting" for a non-complying union which was engaged in an organizational campaign.

The respondent says the question whether the employees who filed charges were fronting for the non-complying union is a question of fact, "to be determined by consideration of all the facts to ascertain who is, in effect, the real par-

15. National Labor Relations Board v. Dant, note 7 supra.

16. National Labor Relations Board v. Express Pub. Co., 1941, 312 U.S. 426, 438–439, 61 S.Ct. 693, 85 L.Ed. 930.

17. W. T. Rawleigh Co. v. N. L. R. B., 7 Cir., 1951, 190 F.2d 832, 837.

18. Cf. Fort Wayne Corrugated P. Co. v. N. L. R. B., 7 Cir., 1940, 111 F.2d 869, 873.

19. A substitute "Appendix A" shall be interpolated, to read as follows:

Appendix A

Notice To All Employees

Pursuant to a Decree of the United States Court of Appeals for the District of Columbia Circuit

Enforcing an Order

of the National Labor Relations Board, and in order to effectuate the policies of the National Labor Relations Act, we hereby notify our employees that:

All our employees are free to become, remain or refrain from becoming members in any union or other labor organization except to the extent that this right may be affected by an agreement in conformity with Section 8(a) (3) of the Act.

NEWS PRINTING CO., INC.
(Employer)

Dated———— By————————
(Representative) (Title)

ty in interest." Thus respondent concedes the problem of fronting presents a question of ultimate fact. It involves evaluation and comparison of basic facts and the formulation of a conclusion therefrom.

The Board's conclusion here that the complaining employees were not fronting does not stand in the same status as its findings of basic facts and, I suggest, is open to judicial scrutiny. The conclusion should not be upheld unless it follows rationally and logically from the basic facts found. I do not think it does.

The respondent said in its decision and order that, in considering the problem of fronting, it is concerned with "the accommodation of these two policies, the protection of the employee and the denial of the processes of this Board to a non-complying labor organization * * *." With respect to that, the Board added:

"* * * We now say only that where it is clear that the rights of an employee under the Act are involved, the protection of those rights is of such paramount importance that we will not deny it simply because a non-complying union may have assisted the individual, or may in some incidental or collateral fashion be aided by our action. * * *"

The implication seems to be that it would be otherwise in a case where the Board's action is of direct, immediate and substantial aid to a union not entitled to ask the Board's aid because it had not complied with § 9(h) of the Act.

There seems to be no express holding here that the non-complying union may be aided by the Board's action only "in some incidental or collateral fashion," but I suppose such a holding is implicit in the decision, since the Board says in its brief, "* * * [A]ny benefit inuring to the Union was remote and incidental." This is an expression of opinion, a conclusion as to an ultimate fact, which is unrealistic and without support in the record.

I am fully convinced from the basic facts that these complainants were act-

ing, not really to obtain redress of personal grievances, but to further the interests of the non-complying union which could not itself invoke the processes of the Board. For this reason I dissent.