The NEWSPAPER GUILD, ERIE NEWS-
PAPER GUILD, LOCAL 187 AFL-
CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Times Publishing Company, Intervenor.

TIMES PUBLISHING COMPA-
NY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Newspaper Guild, Erie Newspaper Guild,
Local 187, Intervenor.

Nos. 72–1521, 72–1633.

United States Court of Appeals,
Third Circuit.

Argued March 8, 1973.

Decided Nov. 30, 1973.

John M. McLaughlin, William C. Sennett, Knox, Graham, Pearson, McLaughlin & Sennett, Erie, Pa., for petitioner in No. 72–1521.

Richard H. Zamboldi, Elderkin, Martin & Kelly, Erie, Pa., for petitioner in No. 73–1633.

Elliot Moore, Deputy Associate Gen. Counsel, Peter G. Nash, Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Joseph E. Mayer, William H. DuRoss, III, Attys., N. L. R. B., Washington, D. C., for respondent.

Before FORMAN, VAN DUSEN and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

This case represents a consolidation of two petitions to review a determination by the National Labor Relations Board (the "Board") and a cross-application by the Board for enforcement of the challenged order.[1] At our No. 72–1521, the Newspaper Guild (the "Union") seeks a reversal of the Board's determination that the Union committed an unfair labor practice under § 8(b)(1)(B) of the National Labor Relations Act[2] (the

---

1. 192 N.L.R.B. No. 159 (May 18, 1972).

2. 29 U.S.C. § 158(b)(1)(B): "It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (B)

an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances; . . . . "

"Act") by disciplining four supervisors who crossed a picket line and performed allegedly struck work. At our No. 72–1633, the Times Publishing Company (the "Employer") requests this Court to compel the Board to reverse its denial of the company's motion to reinstate a § 8(b)(1)(A) complaint[3] and thus open up an inquiry into the reasonableness of the fines levied against the supervisors. By way of cross-petition, the Board seeks enforcement of its order.

The Employer publishes three newspapers in Erie, Pennsylvania.[4] The Union is the collective bargaining agent for the employees of all three. On August 31, 1968, the collective bargaining agree-ment between the Employer and the Union expired. On March 6, 1969, after unsuccessful negotiations, the Union went on strike. A new contract was executed on July 16, 1969. This contract was retroactive to September 1, 1968, and included in its union security provisions all employees except those in top management.[5]

At least ten employees worked during the strike.[6] None of these employees was exempt from the union security provisions. Several had roles of an apparently supervisory nature.[7] Other members filed charges against all ten with the Union in October 1969.[8] After Union trial board proceedings, fines were

3. 29 U.S.C. § 158(b)(1)(A): "It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in Section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; . . . . "

4. The *Erie Morning News, Erie Daily Times* and *Erie Sunday Times-News.*

5. This contract, Respondent's Exhibit No. 7, appears at page 190a and following in the Joint Appendix. It provides, in part: (1) for a closed shop with the exception of (2) the business manager, executive editor, confidential secretary to the Publisher, suburban correspondents, and those employed at space rates, circulation manager, head of the accounting department, managing editor, national, local and classified advertising managers. The only other exception in the contract is: "All of the provisions of this agreement except as to hours and wages shall apply to the following: Sports Editor, Motor Route Supervisor, Manager and Advertising Collections, City Editor, City and County Circulation Managers, Assistant Circulation Manager." The contract (Art. XII) specifies the arbitration of grievances through a four-step process: (1) negotiations between the department head and a committee from the Union; (2) negotiations between a management representative and the Union; (3) mediation by a state or federal mediator; and (4) arbitration.

6. The employees, the amount of their fines and, where the record indicates, their titles, follow:

| Karen Duplanti Ormsbee | Assistant to the Society Page Editor | $4,160 |
|---|---|---|
| Frank Foye | Chief Photographer | 7,102 |
| Jan Hauserman | City Editor | 7,868 |
| George Kloszewski | | 5,829 |
| Richard Kubeja | Telegraph Editor | 7,507 |
| Maria Michaelegro | | 5,179 |
| Betty Peebles | Society Page Editor—Erie Times | 6,947 |
| George Szoszorek | Assistant Circulation Manager | 8,220 |
| Edward Tarkowski | | 5,998 |
| Walter Winkowski | | 5,998 |

7. There were five employees whose "supervisory" status became an issue: Frank Foye, Jan Hauserman, Richard Kubeja, Betty Peebles, and George Szoszorek. The record does not indicate whether the work performed by these employees during the strike was supervisory or rank-and-file.

8. The exact charges do not appear in the record but were apparently "crossing a picket line in violation of the strike vote was a violation of the constitution and the by-laws . . . . " Joint Appendix at 209a.

levied in February 1970. These fines represented the Union's approximation of the employees' earnings during the period of the strike.[9]

On July 28, 1970, the Employer filed unfair labor practice charges with the National Labor Relations Board. The charges alleged a § 8(b)(1)(A)[10] violation of the Act: "the [Union] . . . has, by trial proceedings, threats of excessive fines and the imposition of excessive fines and by other acts and conduct, restrained and coerced employees of Times Publishing Co. in the exercise of the rights guaranteed in Section 7 of the Act."[11] The Employer also alleged a § 8(b)(1)(B) violation of the Act,[12] claiming that the Union had restrained and coerced the Employer "in the selection of its representatives for the purposes of collective bargaining or the adjustment of grievances." The § 8(b)(1)(A) charge was deleted on April 21, 1971 at the suggestion of the Regional Director of the Board. On April 30, 1971, a complaint signed by the Director of Region Six on behalf of the General Counsel was issued against the Union based on § 8(b)(1)(B).

The Trial Examiner conducted hearings in June and July 1971. On October 28, 1971, the Examiner decided that fines against four Union members[13] were § 8(b)(1)(B) violations. A fine against a fifth member[14] was upheld because he was not a supervisor.

The Employer subsequently filed a motion for leave to file a second amended charge and to stay proceedings to permit the General Counsel to amend the Complaint. The amendment would have been a reinstatement of the § 8(b)(1)(A) charge. The Board denied this motion in its May 18, 1972 decision upholding the findings of the Trial Examiner. The Employer's motion for reconsideration of its ruling was denied by the Board on June 22, 1972. This petition to review followed.

The Union opposes the decision of the Trial Examiner and the Board that there was an unfair labor practice under § 8(b)(1)(B). The Union also opposes on both procedural and substantive grounds the introduction of the § 8(b)(1)(A) complaint.

The Board requests that the petitions to review the Board's order should be denied, and a judgment should be issued enforcing the Board's order.

There are two principal questions in this case.

The first (No. 72–1521) is: Has the Union committed an unfair labor practice under § 8(b)(1)(B) of the Act by disciplining supervisor-members for crossing a picket line during an economic strike? The Board's affirmative answer is based upon the rationale that under the Act a § 2(11)[15] supervisor is also a § 8(b)(1)(B) representative for the purposes of collective bargaining or the adjustment of grievances whether or not formally designated as such.

The second question (No. 72–1633) is: Did the Board err in refusing to determine the reasonableness of fines assessed by the Union against its members? The Board has answered negatively.

I

*No. 72–1521.*

The elements of a § 8(b)(1)(B) violation are: (1) that the disciplined

---

9. See note 6.

10. See note 3.

11. Joint Appendix at 3a.

12. See note 2.

13. Hauserman, Kubeja, Peebles, and Szoszorek. See note 6.

14. Frank Foye. See note 6.

15. 29 U.S.C. § 152(11). "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

employee have § 2(11) supervisory status and (2) § 8(b)(1)(B) status as a representative for the purposes of collective bargaining or the adjustment of grievances; and (3) a showing of restraint or coercion in the selection of such a representative. In the instant case, most of the Examiner's opinion is directed toward establishing the first element, supervisory status. The Examiner decided and the Board affirmed that four of the disciplined employees were supervisors and one was not. The Union disputes the findings with respect to the four.

The first employee, City Editor Janice Hauserman, has seven employees under her direction, and assigns them to specific "beats." A second employee, Society Page Editor Betty Peebles, has one assistant whose work she oversees. A third employee, Telegraph Editor Richard Kubeja, has hierarchical if not experiential superiority over at least one employee with whom he works and who follows Kubeja's instructions. Kubeja also exercises independent judgment by substituting for the Managing Editor. A fourth employee, Assistant Circulation Manager Gerald Szoszorek, had the day-to-day supervision of some 30 to 35 employees until November 1968. Subsequently, his job function was somewhat changed to the supervision of 15 district managers. From evidence such as the foregoing, the Examiner concluded that the four employees were § 2(11) supervisors. This Court is of the opinion that there is sufficient evidence in the record to justify the Examiner's conclusion that the four were § 2(11) supervisors.

A more difficult question is posed by the Examiner's approach to the second element of a § 8(b)(1)(B) violation: status as a representative for the purposes of collective bargaining or the adjustment of grievances. The Examiner stated: "All persons who are 'supervisors' within the meaning of Section 2(11) of the Act are employers' 'representatives for the purposes of collective bargaining or the adjustment of grievances' within the purview of Section 8(b)(1)(B) of the Act."[16] The Examiner then cited three cases as authority for what has come to be labeled the "reservoir doctrine."[17]

In *Toledo Blade*,[18] the Board embraced a version of the reservoir doctrine which holds that where the record discloses by way of *substantial evidence* that certain supervisors are natural and likely choices for collective bargaining or grievance adjustment responsibilities in the future they therefore presently qualify under § 8(b)(1)(B). However, the Board in the instant case presents a more sweeping version of the doctrine, that § 2(11) supervisors *automatically* become § 8(b)(1)(B) representatives because they are a reservoir of manpower available and likely to be chosen for such duties at some future date. The Board contends that once these supervisors were disciplined by the union, they could no longer be fully loyal to the employer who would be coerced in his future selection of representatives. The word "selection" in § 8(b)(1)(B) has, according to the Board, both a prospective and a retrospective meaning. No inferences from evidence are necessary, the Board appears to be saying, to justify this second approach.

As heretofore indicated, elements of the reservoir doctrine first appeared in *Toledo Blade,* where the Board found a § 8(b)(1)(B) violation after determining

---

16. Joint Appendix at 218a.

17. N.L.R.B. v. Toledo Locals Nos. 15–P and 272 of the Lithographers and Photo-Engravers Int'l Union, AFL–CIO, 175 N.L.R.B. 1072 (1969) ("Toledo Blade").

International Ass'n. of Heat & Frost Insulators & Asbestos Workers, Local 127 (Cork Insulating Company of Wisconsin, Inc.), 189 N.L.R.B. 854 (1971) ("Cork Insulating").

Detroit Newspaper Printing Pressmen's Union No. 13, Int'l Printing Pressmen and Assistants' Union of North America, AFL–CIO and the Detroit Free Press, 192 N.L.R.B. 106 (1971) ("Detroit Free Press").

18. See note 17.

that the evidence justified the separate conclusions that the employees in question were both supervisors and representatives. The Board then stated that even if the employees were not actually grievance representatives, "their status and roles" made them "such natural and potential representatives of the Blade for the handling and settlement of grievances because of their day-to-day supervision and contacts with the employees in matters that spawn grievances, that the Blade should be entitled to rely upon them, and therefore to select them, as its representatives in handling and settling grievances whenever the occasion might arise."[19] The Court of Appeals for the Sixth Circuit affirmed. It did not specifically approve the "reservoir doctrine" but stated: "This conduct of the union would further operate to make the employees reluctant in the future to take a position adverse to the union, and their usefulness to their employer would thereby be impaired."[20] The *Toledo Blade* approach appears more limited than that espoused by the Board in the instant case in adopting the Examiner's findings because the Board here does not rely upon an evidentiary background.

The "reservoir doctrine" next appeared in *Cork Insulating*[21] where no § 8(b)(1)(B) violation was found when the union fined an employee member for failure to report working with an employee nonmember. The employee was specifically found not to be a statutory supervisor. The Board reaffirmed its position:

"the employer's right to select collective-bargaining and grievance representatives . . . extends . . . to an employer's right, at any time, to select his representatives from an uncoerced group of supervisors whose loyalty to him has not been prejudiced and whose substantial supervisory au-

thority and day-to-day contact with and supervision of the employees under them make them natural choices for selection as such representatives."[22]

The Board indicated, however, that where an employee had never adjusted a grievance it would be necessary to establish by "substantial credible evidence" that "he was nevertheless vested with *theoretical* power to be the Employer's representative . . . ."[23] (Emphasis added.)

In *Detroit Free Press*,[24] the Board found a § 8(b)(1)(B) violation when the union fined a supervisor, Ward, for performing one and one-half minutes of what was ordinarily rank-and-file work. There had been a stoppage of the printing press and Ward had rotated a reel of the press in order to get a sample of the paper involved in the press's stoppage. The supervisor was specifically found to be a grievance adjuster on the basis of credible evidence. Among other things, the Board found that Ward

". . . exercises on-the-spot disciplinary control over the men, including the issuance of disciplinary warnings for minor infractions of the company rules and the suspension of an employee from his work shift for a major infraction of company rules. The authority to exercise these supervisory functions including the discipline of employees resides in Ward whether or not Superintendent Cinder is present at the plant.

\* \* \* \* \* \*

"In addition to the foregoing, the assistant foremen, including Ward, are authorized to handle the problems which may arise in the assistant foreman's area during the shift; this includes complaints or grievances of the

19. 175 N.L.R.B. 1072, 1079 (1969).

20. 437 F.2d 55, 57 (6th Cir. 1971).

21. See note 17.

22. 189 N.L.R.B. 854, 857 (1971).

23. *Id.*

24. See note 17.

employees as well as problems which concern the equipment."[25]

The Board in *Detroit Free Press* did not find that *any* supervisor is also a § 8(b)(1)(B) representative, but that some supervisors not so designated form a class from which management might naturally seek its representation and may thereby, *when credible evidence is presented,* be considered § 8(b)(1)(B) representatives.

■ The Board did not in the instant case find a § 8(b)(1)(B) status from a formal contractual provision. Indeed. the parties have agreed that the four disciplined supervisor members were not formally-designated representatives. The Board did not, as in *Toledo Blade,* find that the supervisors had informal grievance-handling powers. The Board, however, argued on this appeal that Hauserman, Kubeja, and Szoszorek had minor grievance-handling powers.[26] In fact the existence and usage of these powers is borne out by evidence in the record.[27] The Board does not specify grievance-handling functions for Peebles, nor does the record disclose any. For Hauserman, Kubeja, and Szoszorek, § 8(b)(1)(B) status may be granted whether their informal grievance-handling powers are viewed as sufficient by themselves as in *Toledo Blade,* or as forming the class of natural and likely representatives which the credible evidence delineates as in *Detroit Free Press.*

■ In none of the three cases cited as bearing on the "reservoir doctrine" by the Board does a § 2(11) supervisor *automatically* become a § 8(b)(1)(B) representative. Each case requires an evidentiary basis from which § 8(b)(1)(B) status may be inferred. Hence Betty Peebles cannot be considered a § 8(b)(1)(B) representative on the basis of the applicable law.

The third element in determining whether there is a § 8(b)(1)(B) violation is "restraint or coercion." Guidance is provided by three recent, although conflicting, decisions:

National Labor Relations Board v. San Francisco Typographical Union No. 21, 486 F.2d 1347 (9th Cir. 1973) ("San Francisco");

International Brotherhood of Electrical Workers, AFL–CIO, and Local 134, International Brotherhood of Electrical Workers, AFL–CIO v. National Labor Relations Board, 487 F. 2d 1143 (D.C.Cir. 1973) ("International Brotherhood");

National Labor Relations Board and Wisconsin Electric Power Company v. Local 2150, International Brotherhood of Electrical Workers, AFL–CIO, 486 F.2d 602 (7th Cir. 1973) ("Wisconsin Electric").[28]

In *San Francisco,* the Court of Appeals for the Ninth Circuit held that the union violated § 8(b)(1)(B) when it disciplined a foreman who discharged an employee prior to a strike and reversed the Board's finding that disciplining three strikebreakers who were also supervisors was an unfair labor practice. Concerning the foreman, the court said, "By fining Dixon [the foreman], the Union interfered with Dixon's position as a supervisor and committed an unfair labor practice under Section 8(b)(1) (B)." Concerning the three strikebreakers, the court said, "[T]he Union did not punish them for exercising any management duty. * * * The Journal's right to select management representatives under Section 8(b)(1)(B) is not affected by the Union's action." [29]

*San Francisco* is in agreement with *International Brotherhood,* in which the Court of Appeals for the District of Columbia Circuit consolidated and reheard

---

25. 192 N.L.R.B. 106, 107 (1971).

26. Board's brief at 12–13.

27. Joint Appendix at 48–49a (Hauserman), 67–68a (Kubeja), and 57–58a, 60–61a (Szoszorek).

28. These cases were decided by the courts subsequent to the Board's decision in the case at hand.

29. N.L.R.B. v. San Francisco Typographical Union No. 21, 486 F.2d at 1349 (9th Cir., 1973).

two cases en banc. These involved *Florida Power & Light Co.* (No. 71–1712) and *Illinois Bell Telephone Co.* (No. 71–1559).[30] In *International Brotherhood,* Judge J. Skelly Wright, author of the majority opinion, posed the question:

"Does a union commit an unfair labor practice under Section 8(b)(1)(B) . . . by disciplining supervisor-members for crossing a picket line and performing rank-and-file struck work during a lawful economic strike against the company?" [31]

The answer was in the negative. In sum, the Court held that the literal language of § 8(b)(1)(B), the legislative history, and the case law did not support the Board's affirmative answer.

There are significant distinctions between the instant case and the two cases resolved by the Court of Appeals for the District of Columbia Circuit in *International Brotherhood.* In one, *Florida Power,* the disciplined supervisor-union members were not themselves represented by the union for collective bargaining purposes. They were, however, entitled to certain pension, disability, and death benefits. The contract between employer and union did not provide discipline for acts performed as supervisors, and there were, in fact, no fines for the performance of supervisory functions. The fines were for rank-and-file struck work. Not only were fines levied, but some members were expelled. In the other case, *Illinois Bell Telephone,* the supervisors were both within and without the bargaining unit. The contract did not provide for a waiver by the union of its right to discipline supervisor-members. When the strike occurred, the local warned its members not to perform rank-and-file work. Some did, and were fined.

In both *International Brotherhood* cases, the disciplined supervisors were § 8(b)(1)(B) representatives for the purposes of adjusting grievances and collective bargaining. The dispute was whether a fine for performing rank-and-file work would indirectly coerce the Employer because the loyalty of the representatives could be alienated.

In the case at hand, the disciplined supervisors were *not* statutory representatives. The supervisors also have a much closer relationship to the Union than in the *International Brotherhood* cases, particularly *Florida Power and Light.* Thus, the *International Brotherhood* cases represent a more extreme situation than the instant case. Neither does the record here disclose whether the supervisors did supervisory work or rank-and-file work during the strike.

*International Brotherhood* places the problem in the broader perspective of §§ 14(a) and 2(3) of the Act.[32] Section 14(a) provides employers with the op-

---

30. The evolution of decisions on the subject matter of the issues in these cases is analyzed in great detail in *International Bhd.*

31. International Bhd. of Elec. Workers, AFL–CIO and Local 134, Int'l. Bhd. of Elec. Workers, AFL–CIO v. N.L.R.B., 487 F.2d at 1143 (D.C.Cir. 1973).

32. Section 14(a) states:
"(a) Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining." 29 U.S.C. § 164(a).
Section 2(3) reads:
"(3) The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined." 29 U.S.C. § 152(3).

tion of not treating supervisors as employee-union members. Section 2(3) defines employees and specifically excludes supervisors. Section 2(11) defines supervisors.[33] In comparing the § 2(11) definition of supervisor with the § 8(b)(1)(B) definition of representative, the court observed that the former is intended to deal with the "problem of supervisor-union member conflict of loyalties, . . ." that the scope of the latter is "much narrower,"[34] and that the Board's approach creates an "awkward dichotomy" between those who fit under both definitions and those who do not.[35]

*Wisconsin Electric,* whose facts[36] resemble those of *Florida Power and Light,* holds an opposite view: that there is an unfair labor practice when a union disciplines supervisors who are § 8(b)(1)(B) representatives for performing rank-and-file struck work. In *Wisconsin,* unlike the instant case, the union did not appeal the Board's finding that the supervisors qualified under § 8(b)(1)(B). The union in *Wisconsin* argued on appeal that disciplinary action for the performance of struck work was justified. But the court, relying heavily on the initial decision in *International Brotherhood,*[37] determined that when supervisors perform struck work it is an

exercise of managerial responsibility and "an essential part of the economic warfare involved in a strike" for management to withstand the union's coercion. (486 F.2d at 608.) Moreover, the court noted that the employer as a public utility had "an especial obligation to continue to provide an indispensable public service during a time of strike." (Id.) In a footnote, the court disagreed with the majority opinion in the en banc decision in *International Brotherhood.*[38]

Inherent in *International Brotherhood, San Francisco,* and *Wisconsin Electric* was the requirement that a determination be made whether the work the disciplined supervisory employees were performing was rank-and-file struck work or supervisory work prior to establishing the third element of a § 8(b)(1)(B) violation: "to *restrain* or *coerce* . . . an employer in the *selection* of his representatives for the purposes of collective bargaining or the adjustment of grievances; . . . ." (Emphasis added.)[39] Here no such finding was made by the Board. Nor does the record provide sufficient evidence for such a finding. Without it, the Board lacked an element essential to a determination of an unfair labor practice. Hence, this case must be remanded to the Board to ascertain the type of

---

33. See note 15.

34. International Bhd. of Elec. Workers, AFL–CIO and Local 134, Int'l Bhd. of Elec. Workers, AFL–CIO v. N.L.R.B., 487 F.2d at 1143 (D.C.Cir. 1973).

35. *Id.* 1167.

36. The 60 supervisors in *Wisconsin* held qualified union memberships, and were not part of the bargaining unit. They carried "union withdrawal" cards which meant that there was no obligation to pay dues. The supervisors could "regain regular membership without fulfilling normal reinstatement requirements." Holders were also entitled to pension and insurance benefits. Holders could not attend meetings.

37. International Bhd. of Elec. Workers v. N.L.R.B., 487 F.2d 1113 (D.C.Cir. 1972).

38. The court said:
"This opinion was prepared before the release of the District of Columbia's *en banc*

opinion in International Brotherhood of Electrical Workers v. National Labor Relations Board, 487 F.2d 1143, decided June 29, 1973. In its *en banc* opinion the District of Columbia Circuit also disposed of National Labor Relations Board v. Florida Power & Light Co., wherein some of the supervisors disciplined for performing struck work were not included in the bargaining unit, were not represented by the union in bargaining, were only affiliated with the union by virtue of withdrawal cards, and were not shown to have been accorded an *express option* by the employer as to working during the strike. At the very least, insofar as it reaches an opposite conclusion on these facts, *we disagree with the majority opinion therein* and are in accord with Judge MacKinnon's dissenting opinion representing the views of himself and Judges Tamm, Robb, and Wilkey." (Emphasis added.) (486 F.2d at 606.)

39. See note 2.

work performed during the strike by the disciplined supervisory employees, Kubeja, Hauserman, and Szoszorek.

## II

*No. 72–1633*

The actions leading to the Board's denial of the complaint based on the Employer's charge, as amended, of a § 8(b)(1)(B) violation are recited in detail on pages 418–419 of this opinion. The Employer's petition here is to review the Board's denial of the Employer's post-hearing motion for leave to file a second amended charge, and to stay the proceedings before the Board to permit General Counsel to amend the complaint to include a reinstatement of the § 8(b)(1)(A) charge as originally presented by the Employer but deleted at the instance of the Regional Director. The purpose of the § 8(b)(1)(A) charge was to place in issue for the determination by the Board the reasonableness of the fines assessed by the Union against its members. The alleged violation of § 8(b)(1)(B), on the other hand, placed before the Board only the question of whether the disciplined workers had such supervisory status as to immunize them from Union penalties for engaging in struck work.

The reason motivating the Regional Director to advise the Employer that he did not intend to issue a complaint alleging a § 8(b)(1)(A) violation of the Act was that the Board had recently ruled in the cases of International Association of Machinists and Aerospace Workers, Local Lodge No. 504 (Arrow Development Co.) and David O'Reilly, 185 N.L.R.B. 365 (1970) and Booster Lodge No. 405 International Association of Machinists and Aerospace Workers, AFL–CIO, and The Boeing Company, 185 N.L.R.B. 380 (1970) that the Board was not empowered or required to rule upon the reasonableness of the Union fines. Thus prompted, the Employer filed an amended charge alleging only violations of § 8(b)(1)(B) of the Act without specifically withdrawing its original charge of a § 8(b)(1)(A) violation.

After the Trial Examiner's decision had issued, resulting in a finding that § 8(b)(1)(B) had been violated, the United States Court of Appeals for the District of Columbia Circuit reversed the decision of the Board in *Booster Lodge, supra,* and remanded the case to the Board for a determination of the reasonableness of fines levied by the Union in that case.[40]

Before the Board had acted upon the decision of the Examiner in the instant case, the Employer made its motion for leave to file a second amended charge consisting of a restatement of the original charge, citing authorities[41] which it contended supported the granting of like motions. It emphasized that it had not withdrawn the allegation of the § 8(b)(1)(A) violation and argued that thus there was no bar to the granting of its motion.

The Board, as has been noted, approved the decision of the Examiner with only certain modifications, irrelevant here. As to Employer's motion for leave to file a second amended charge, the Board commented:

"2. Because insufficient basis therefor has been shown, the Charging Party's motion for leave to file a second amended charge and to stay proceedings to permit General Counsel to amend the complaint is denied."[42]

The Board determined that the institution of an unfair labor practice complaint is solely within the unreviewable discretion of General Counsel. It also took the position that it had no power to inquire into the reasonableness of fines

---

40. Booster Lodge No. 405, Int'l Ass'n. of Machinists and Aerospace Workers v. N.L. R.B., 148 U.S.App.D.C. 119, 459 F.2d 1143 (1972).

41. N.L.R.B. v. Kobritz, 193 F.2d 8 (1st Cir. 1951) and News Printing Company, Inc. v. N.L.R.B., 98 U.S.App.D.C. 14, 231 F.2d 767 (1956).

42. Joint Appendix at 248a n. 2.

imposed by the Union upon its members. The Employer then moved that the Board reconsider its denial of the motion, which was also denied.[43]

Upon motion of the Board, this court ordered Employer's petition for review, No. 72–1633, to be consolidated with the Union's petition for review, No. 72–1521, for purposes of briefing and oral argument.

In its argument here for the granting of its petition for review, the Employer stressed the Board's responsibility to review and set aside the fines in the present case because "they were excessive, unreasonable and based upon the arbitrary fiat of the union leaders." It found comfort for its contention in National Labor Relations Board v. Allis-Chalmers Manufacturing Company, 388 U.S. 175, 204, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); Scofield v. National Labor Relations Board, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969) and other cases, but relied heavily upon the reversal of the Board in Booster Lodge No. 405, International Association of Machinists and Aerospace Workers v. National Labor Relations Board, 148 U.S. App.D.C. 119, 459 F.2d 1143 (1972).

■ The federal courts indeed do not have jurisdiction to review the decision of the General Counsel in refusing to issue a complaint.[44] Hence this court is without power to interfere with the decision of the General Counsel in his refusal to amend the complaint so as to include therein a charge that the Union violated § 8(b)(1)(A) and a charge that fines were allegedly excessive in violation of § 8(b)(1)(B).

Unhappily for the Employer, whose brief was filed November 3, 1972, the United States Supreme Court on December 18, 1972 granted certiorari in *Booster Lodge* as a companion case to National Labor Relations Board v. Boeing Co., 409 U.S. 1074, 93 S.Ct. 675, 34 L.Ed.2d 662, and filed its opinion on May 21, 1973, in National Labor Relations Board v. Boeing Co., 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973). In this opinion the Court considered arguments similar to those made by the Employer here, but it reversed the decision of the Court of Appeals in *Booster*.[45]

■ Neither are we persuaded that distinctions argued by the Employer

---

43. Joint Appendix at 256a.

44. Saez v, Goslee, 463 F.2d 214 (1st Cir. 1972) (General Counsel refused to issue a complaint when plaintiff filed an unfair labor charge against former employer); Henderson v. Int'l. Longshoremen's Local 50, 457 F.2d 572, 578 (9th Cir. 1972) (Court of Appeals had no jurisdiction to review General Counsel's refusal to institute an unfair labor practice complaint); United Elec. Contractors Ass'n. v. Ordman, 366 F.2d 776 (2d Cir. 1966) (District Court may not review General Counsel's exercise of discretion). See also Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (dictum) (employee entitled to review of complaint by Board; General Counsel may refuse to institute a complaint).

45. The Court held in Boeing,
"Inquiry by the Board into the multiplicity of factors that the parties and the Court of Appeals correctly thought to have a bearing on the issue of reasonableness would necessarily lead the Board to a substantial involvement in strictly internal union affairs. While the line may not always be clear between those matters that are internal and those that are external, to the extent that the Board was required to examine into such questions as a union's motivation for imposing a fine it would be delving into internal union affairs in a manner which we have previously held Congress did not intend. [Footnote omitted.] Given the rationale of *Allis-Chalmers* and *Scofield*, the Board's conclusion that § 8(b)(1)(A) of the Act has nothing to say about union fines of this nature, whatever their size, is correct. Issues as to the reasonableness or unreasonableness of such fines must be decided upon the basis of the law of contracts, voluntary associations, or such other principles of law as may be applied in a forum competent to adjudicate the issue. Under our holding, state courts will be wholly free to apply state law to such issues at the suit of either the union or the member fined." 412 U.S. 67, 74, 93 S.Ct. 1952, 1956, 36 L.Ed.2d 752 (1973).

such as that the amendment of its charge to a § 8(b)(1)(B) violation, without the specific withdrawing of the § 8(b)(1)(A) violation, shield it from the pronouncement of the Supreme Court in *Boeing*. There it is clearly adjudicated that the Board is without authority to inquire into the reasonableness of a penalty assessed by the union, so long as the penalty does not impair the employment status of the member. The union or the member must seek elsewhere for any redress to which it or he may be entitled.

### III

In No. 72–1521, the Board is reversed in its determination that Peebles was a § 8(b)(1)(B) representative, since no credible evidence supports the Board's conclusion. The Board is affirmed in its findings that Hauserman, Kubeja, and Szoszorek were § 8(b)(1)(B) representatives. The case is remanded to the Board for findings on the type of work performed by the three during the strike —whether supervisory or rank-and-file struck work—and a determination in the light of *International Brotherhood, San Francisco,* and *Wisconsin Electric.* Nothing contained herein is to be regarded at this time as an intimation of our acceptance of either of the positions adopted in those cases.

In No. 72–1633, the action by the Board in denying the motion of the Employer for leave to file a second amended charge and to stay the proceedings to permit General Counsel to amend the complaint, and in refusing to inquire into the reasonableness of the fines is affirmed. The petition of the Employer is denied.

The cross-application of the Board for enforcement of its order against the Union is denied.

The Board should submit a judgment consistent with this opinion.